**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| FERNANDO RUIZ, individually and on behalf of all others similarly situated, | No. 12-56589 |
| *Plaintiff-Appellant*, | D.C. No. 3:05-cv-02125-JLS-KSC |
| v. | |
| AFFINITY LOGISTICS CORPORATION, *Defendant-Appellee*. | OPINION |

Appeal from the United States District Court
for the Southern District of California
Janis L. Sammartino, District Judge, Presiding

Submitted February 22, 2013[*]
San Francisco, California

Filed June 16, 2014

Before: Harry Pregerson and Richard A. Paez, Circuit
Judges, and James P. Jones, District Judge.[**]

Opinion by Judge Pregerson

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

[**] The Honorable James P. Jones, District Judge for the U.S. District Court for the Western District of Virginia, sitting by designation.

## SUMMARY[***]

### Labor Law

Reversing the district court's judgment on remand, the panel held that home delivery drivers who alleged failure to pay sick leave and other state-law causes of action were employees, rather than independent contractors, under California law.

The panel reasoned that the drivers' employer had the right to control the details of their work, and that additional, secondary factors also weighed in favor of a finding that the drivers were employees. The panel remanded the case to the district court for further proceedings.

### COUNSEL

Daniel A. Osborn, Osborn Law, P.C., New York, New York, for Plaintiff-Appellant.

James H. Hanson, Scopelitis, Garvin, Light, Hanson & Feary, P.C., Indianapolis, Indiana, for Defendant-Appellee.

---

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

PREGERSON, Circuit Judge:

This is the second time this case is before us. Plaintiff-Appellant Ruiz and putative class members (collectively, "drivers") are California residents who worked for Defendant-Appellee Affinity Logistics ("Affinity"), a Georgia corporation. Drivers allege that Affinity wrongfully classified them as independent contractors; failed to pay them sick leave, vacation, holiday, and severance wages; and improperly charged them workers' compensation insurance fees. The outcome of these state law causes of action depends on whether the drivers were employees or independent contractors of Affinity.

This case first came before us after the district court, following a three-day bench trial in December 2009, held that the drivers were independent contractors under Georgia law. Ruiz appealed. On February 8, 2012, in *Ruiz v. Affinity Logistics Corporation* ("*Affinity I*"), 667 F.3d 1318, 1325 (9th Cir. 2012), we concluded that California law, not Georgia law, applies to the independent contractor versus employee question in this case, and remanded the matter to the district court. On remand, the parties agreed that no further evidence was necessary. The district court ordered the parties to submit briefs arguing their respective contentions under California law. Based on these briefs and the December 2009 bench trial record, the district court, on August 27, 2012, issued a memorandum decision and order concluding that, under California law, the drivers were independent contractors.

Ruiz timely appealed the district court's judgment on remand. We have jurisdiction under 28 U.S.C. § 1291. For the reasons set forth below, we reverse.

## FACTUAL BACKGROUND

The following facts are undisputed.

### A. Affinity's Hiring of Ruiz

Fernando Ruiz previously worked as a driver for Penske Logistics Corporation, a furniture delivery company that had a contract with Sears. His job status was that of an "employee." When Sears terminated its contract with Penske in November 2003, Sears advised the drivers that Affinity Logistics Corporation ("Affinity"), a company providing home delivery services for various home furnishing retailers,[1] would take over Penske's contract. Sears advised Ruiz and other drivers employed by Penske to speak with Danny Hansen, an Affinity manager, about working for Affinity.

Hansen told Ruiz and the other drivers that if they wished to be hired by Affinity, they had to become independent contractors. Specifically, Hansen told the drivers they needed a fictitious business name, a business license, and a commercial checking account. Affinity then advised the drivers on how to complete the necessary forms. Affinity went so far as to complete the forms for Ruiz, leaving only the spaces for his signature blank. With Affinity's help, Ruiz formed R&S Logistics ("R&S"). Ruiz obtained a Federal

---

[1] Affinity describes itself as an "experienced and competent home delivery contractor [that] desires to perform home delivery services."

Employer Identification Number and a separate business banking account for R&S.

Additionally, to work for Affinity, each driver was required to sign an Independent Truckman's Agreement ("ITA") and Equipment Lease Agreement ("ELA"). The ITA and the ELA included clauses stating that the parties were entering into an independent contractor relationship. The ITA and ELA stated:

> **Control and Exclusive Use**. . . . The parties intend to create an independent contractor relationship and not an employer-employee relationship.
>
> **Independent Contractor**
>
> (a) Contractor,[2] in the performance of this Agreement, will be acting in his own separate capacity and not as an agent, employee, partner, joint venture or associate of Affinity. It is expressly understood and agreed that Contractor is an independent contractor of Affinity in all manners and respects and that Contractor is not authorized to bind Affinity to any liability or obligation or to represent that it has any authority. . . .

The ITA was a one-year contract that automatically renewed from year to year. The contract could be terminated at any time by either party without cause upon giving the other party sixty days notice, or with cause upon breach of contract. The

---

[2] The ITA and ELA repeatedly referred to the drivers as "Contractors."

ITA set out the drivers' rate of pay, which, regardless of experience, was a flat "per stop" rate of $23.00 in 2004. The ITA also included a provision that a driver "at [Affinity's] option, may be transferred to another location then being served by [Affinity]," and a driver's failure to comply with a transfer would be a breach of the ITA.

After Ruiz and the other drivers signed the ITA and ELA, the drivers received an Affinity Contractor Procedures Manual ("Procedures Manual"). The Procedures Manual, prepared by Affinity, outlined procedures drivers were required to follow regarding loading trucks, delivering goods, installing goods, interacting with customers, reporting to Affinity after deliveries, and addressing returns and refused merchandise, damaged goods, and checking in with Affinity after deliveries. The Procedures Manual included mandatory language such as "must," "will report," "must contact," "required," "not acceptable," "100 percent adherence," and "exactly as specified."

Affinity hired Ruiz as a driver in 2003. Ruiz worked for Affinity from November 2003 to October 2004. Ruiz and the other drivers were responsible for loading furniture and appliance deliveries, unloading the deliveries, and installing the deliveries. Affinity did not require that drivers obtain special licenses. Nor did Affinity require that drivers have any specific work experience or training; rather, drivers simply had to have a driver's license, sign the ITA and ELA, and pass a drug test and physical exam.

## B.  Affinity's Regulation of Its Drivers

Drivers regularly worked about five to seven days per week. An Affinity employee would call the drivers each day

to tell them whether or not they were working the following day. Drivers had a fairly regular rate of pay since they worked five to seven shifts per week, and every route had approximately eight deliveries. Drivers had to request time off three to four weeks in advance, and Affinity had discretion to deny those requests. Affinity denied requests for time off when it decided the delivery schedule was too busy.

Affinity encouraged, if not required, drivers to lease trucks from Affinity. All but one driver in the San Diego area leased their trucks from Affinity. Affinity automatically deducted $350 per week from a driver's paycheck to pay for the leased truck. Drivers were required to paint their trucks white, and could not put signs on their trucks. The trucks had a Sears logo and Affinity's name and motor carrier number on the door. Most drivers drove the same truck every day. Affinity handled upkeep of trucks and arranged for loaner trucks when trucks broke down, deducting these costs from drivers' pay.

Affinity required drivers to stock their trucks with certain supplies, as outlined in the Procedures Manual. These supplies included appliance and furniture totes, plastic mattress return bags, protective blankets, pads, tie-down straps, and tools including a level, power drill, and drill bits. Affinity required that drivers use a specific type of mobile telephone. Affinity supplied the phones and deducted monthly costs for the phones from drivers' paychecks. Affinity also required each driver to have a "helper" or secondary driver on the truck with them. Helpers had to submit to a background check and be approved by Affinity.

While working for Affinity, at 6:00 or 6:30 a.m. everyday, drivers were required to report to the San Diego

Market Delivery Operation ("MDO") warehouse where Affinity's offices were located. When drivers arrived at the MDO, they had to report to one of the supervisors and pick up their route manifests, which told them how many deliveries they had that day and where the deliveries were. Drivers then checked to make sure they had all the furniture and appliances to be delivered.

Next, as outlined in the Procedures Manual, Affinity required drivers and helpers to attend a fifteen to thirty minute "stand-up" meeting at 7:15 a.m. The stand-up meeting was led by an Affinity supervisor. The Affinity supervisor would review the drivers' customer satisfaction survey scores from previous deliveries, discuss problems encountered in recent deliveries, and discuss any other issues Affinity thought would be "beneficial to help [drivers] out in the field."

Drivers were required to wear uniforms and abide by certain grooming requirements, as set forth in the "Delivery Team Apparel and Appearance" section of the Procedures Manual. The uniform consisted of an "industrial light blue [shirt] with blue stripe, American flag on sleeve, emblem with 'Sears-Authorized Delivery'"; black pants; a belt without a metal buckle; and "industrial, black leather shoes" ordered from a particular company, Lehigh Safety Shoes. Drivers had to keep their shoes "neat and clean." Affinity provided the uniforms, but charged drivers for them by deducting the costs from drivers' paychecks. Affinity also required that tattoos and piercings be covered or removed and that facial hair be "neatly groomed and properly shaved surrounding the beard." Affinity provided shaving kits to drivers with facial hair that did not meet Affinity's grooming requirements.

After each morning stand-up meeting, Affinity required that Hansen or Jimmy Starnes, another Affinity supervisor, check the drivers' trucks to ensure that drivers had the required tools, that deliveries were loaded with the necessary padding and properly secured, and that no appliances were left on the dock. The supervisors also checked that the drivers were in their required uniform and properly groomed.

Drivers made deliveries according to the route manifests Affinity provided to them daily. Drivers could not control the order of deliveries; they were instructed in the Procedures Manual to maintain "100 percent adherence" to the manifests created by Affinity. The assignment of routes was based on scores drivers received from Sears's customer surveys known as the Quality Measurement/Incentive Program. Drivers with higher scores selected their routes first, while drivers with lower scores were given the least desirable routes.

Affinity required drivers to call an automated Sears customer service number after each delivery; this requirement is listed in the Procedures Manual as "a very important requirement." During these calls, drivers would report the stop number that was just completed, the arrival time, and departure time. Throughout the day, drivers also had to contact an Affinity supervisor after every two or three deliveries. When a driver did not call, Affinity would call the driver to find out the driver's location. If a driver was running late, Affinity would call Sears to inform them that Affinity had "a driver running late." Affinity supervisors also monitored the progress of each driver throughout the day on a "route monitoring screen," and would contact a driver if they noticed he or she was running late or off-course.

Affinity also engaged in "follow-alongs," whereby an Affinity supervisor followed a driver for a few stops to ensure that the driver was wearing the uniform and using proper delivery techniques. Sometimes the Affinity supervisor would talk to a customer after a delivery to evaluate the driver's performance. Occasionally, for heavier loads, the Affinity supervisor would also assist the driver in a delivery.

After drivers completed their daily delivery routes, they returned to the warehouse to park their trucks. At the end of the day, drivers were required to fill out a form (also known as a "cover sheet"), and return the route manifest to Affinity. Drivers left the trucks and the keys for the trucks at the MDO warehouse. Affinity admitted that it "strongly discouraged" drivers from taking the trucks home or otherwise removing trucks from the warehouse lot overnight or on weekends. Moreover, Affinity sometimes used the drivers' trucks for other jobs. Drivers were told to leave their keys at the MDO "just in case they need that truck to run another load with somebody else." Affinity did not compensate drivers for the use of their trucks for these other deliveries.

## PROCEDURAL BACKGROUND

Ruiz's claims—Affinity's wrongfully classifying the drivers as independent contractors; Affinity failing to pay drivers sick leave, vacation, holiday, and severance wages; and Affinity improperly charging drivers for workers' compensation insurance[3]—turn on whether the drivers are independent contractors or employees of Affinity. After a

---

[3] Ruiz also alleged a claim for overtime pay, but on June 5, 2008, the district court granted Affinity's motion for summary judgment as to this claim. Ruiz does not appeal that ruling.

three-day bench trial in December 2009, the district court concluded that Georgia law applied to the independent contractor/employee question and that Ruiz was an independent contractor under Georgia law. Ruiz appealed the district court's ruling.

On February 8, 2012, in *Affinity I*, we held that California law, not Georgia law, applies and remanded the matter to the district court to apply California law. *See Affinity I*, 667 F.3d at 1325. On remand, the district court filed a memorandum decision and order on August 27, 2012, holding that, under California law, the drivers were independent contractors rather than employees of Affinity. The district court based its findings on evidence from the December 2009 bench trial and arguments made by the parties in their briefs following remand.[4]

Ruiz timely appealed the district court's August 27, 2012 memorandum decision and order.

## STANDARD OF REVIEW

The California Supreme Court has held that the standard of review for the employee versus independent contractor question under California law may be de novo or clear error, depending on whether the facts are disputed:

---

[4] At a March 28, 2012 hearing, the district court asked the parties whether they wanted to introduce additional evidence. According to the district court, "[t]he parties represented that no further evidence was necessary, and that the case would not need to be retried." Neither party asked to submit additional evidence.

> The determination of employee or
> independent-contractor status is one of fact if
> dependent upon the resolution of disputed
> evidence or inferences, and the Division [of
> Labor Standards Enforcement]'s decision
> must be upheld if substantially supported. If
> the evidence is undisputed, the question
> becomes one of law, but deference to the
> agency's view is appropriate.

*S.G. Borello & Sons, Inc. v. Dep't of Industrial Relations*
("*Borello*"), 769 P.2d 399, 403 (Cal. 1989) (citations
omitted).

This case requires us to address the independent
contractor versus employee question under California law.
Because the parties do not dispute the operative facts, the
standard of review is de novo under *Borello*. Thus, we
review de novo the district court's legal conclusion that the
drivers were independent contractors. We review, however,
the district court's underlying factual findings following a
bench trial for clear error. Fed. R. Civ. P. 52(a)(6); *Twentieth
Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 879
(9th Cir. 2005). A finding is clearly erroneous if we are "left
with the 'definite and firm conviction that a mistake has been
committed.'" *Id.* (quoting *Easley v. Cromartie*, 532 U.S. 234,
242 (2001)); *United States v. Hinkson*, 585 F.3d 1247,
1260–61 (9th Cir. 2009).

## DISCUSSION

"[U]nder California law, once a plaintiff comes forward
with evidence that he provided services for an employer, the
[plaintiff] has established a prima facie case that the

relationship was one of employer/employee." *Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010). The burden then shifts to the employer to "prove, if it can, that the presumed employee was an independent contractor." *Id.* (citing *Cristler v. Express Messenger Sys., Inc.*, 89 Cal. Rptr. 3d 34, 43–44 (Cal. Ct. App. 2009)). Because Ruiz has shown that he provided services for Affinity, the burden shifts to Affinity to demonstrate, if it can, that Ruiz and the other drivers were independent contractors, not employees.

The California Supreme Court has explained that to determine whether a worker is an employee or independent contractor, a court should evaluate "[e]ach service arrangement . . . on its facts, and the dispositive circumstances may vary from case to case." *See Borello*, 769 P.2d at 407. The *Borello* court, however, also provided a number of factors that should guide courts in making that determination. First, the *Borello* court stated that "the right to control work details is the *most important or most significant* consideration." *Id.* at 404 (emphasis added) (internal quotation marks omitted); *see also Tieberg v. Unemp't Appeals Bd.*, 471 P.2d 975, 977 (Cal. 1970) (holding that "[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired"); *Estrada v. FedEx Ground Package Sys.*, 64 Cal. Rptr. 3d 327, 335 (Cal. Ct. App. 2007) ("The essence of the test is the 'control of details'—that is, whether the principal has the right to control the manner and means by which the worker accomplishes the work . . . .").

In *Borello*, the California Supreme Court also explained that additional, "secondary" factors may be relevant in making that determination:

These include (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Borello*, 769 P.2d at 404; *see also Tieberg*, 471 P.2d at 980 (referring to these factors as "secondary elements"). "Generally, . . . [these] individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." *Germann v. Workers' Comp. Appeals Bd.*, 176 Cal. Rptr. 868, 871 (Cal. Ct. App. 1981). Regarding the final secondary factor, the California Court of Appeal has noted that the label that parties place on their employment relationship "is not dispositive and will be ignored if their actual conduct establishes a different relationship." *Estrada*, 64 Cal. Rptr. 3d at 355.

As we explain below, contrary to the district court's conclusion, the totality of the undisputed facts indicate that

the drivers were Affinity's employees rather than independent contractors.

### A. Primary Factor: Affinity Had the Right to Control the Details of the Drivers' Work

In *Borello*, the California Supreme Court "emphasize[d] that the [defendant] growers, though purporting to relinquish supervision of the harvest work itself, retained absolute overall control of . . . [a]ll meaningful aspects of this business relationship: price, crop cultivation, fertilization and insect prevention, payment, [and] right to deal with buyers . . . ." 769 P.2d at 407–08 (third and fourth alterations in original) (citations omitted) (internal quotation marks omitted). In these circumstances, the court concluded, the defendant "retains all *necessary* control over the harvest portion of its operations." *Id.* at 408; *see also JKH Enters., Inc. v. Dep't of Indus. Relations*, 48 Cal. Rptr. 3d 563, 579 (Cal. Ct. App. 2006) (holding that "[b]y obtaining the clients in need of the service and providing the workers to conduct it, [delivery company defendant] retained all *necessary* control over the operation as a whole").

Here, the undisputed facts indicate that Affinity had the right to control the details of the drivers' work, and that Affinity retained all necessary control over the drivers' work. Like defendant FedEx in *Estrada*, a case where the California Court of Appeal held that FedEx delivery drivers were employees, Affinity controlled the drivers' rates, schedules, and routes. 64 Cal. Rptr. 3d at 336. Affinity set the drivers' flat "per stop" rate; the drivers could not negotiate for higher rates, as independent contractors commonly can. *See Borello*, 769 P.2d at 409–10. Affinity decided the days drivers worked, and retained the discretion to deny drivers' requests

for days off.   Affinity determined routes, and instructed drivers not to deviate from the order of deliveries listed on the route manifests Affinity created.

Like FedEx in *Estrada*, Affinity also controlled the equipment—the trucks, tools, and mobile phones—and the helpers the drivers used.  *See Estrada*, 64 Cal. Rptr. 3d at 336 (holding that drivers were FedEx's employees in part because "[t]he larger items—trucks and scanners—are obtained from FedEx approved providers, [are] usually financed through FedEx, and [are] repaid through deductions from the drivers' weekly checks").

Affinity controlled the appearance of the drivers by requiring that drivers wear uniforms and by prohibiting drivers from wearing earrings, displaying tattoos, and sporting certain designs of facial hair.  The district court recognized that Affinity regulated the drivers' uniforms and appearance, but dismissed these measures of control as "driven by a need to comply with federal regulations or with Sears' requirements."  But, in *Estrada*, the California Court of Appeal "summarily reject[ed] FedEx's suggestion that [uniform and grooming] constraints such as these are necessary to ensure the drivers' compliance with government regulations."  64 Cal. Rptr. 3d at 336 n.9; *see also Borello*, 769 P.2d at 409 n.13 (rejecting defendant's argument that because defendant's customers made defendant adopt the contract with its migrant workers, the contract should not be considered as evidence of control).  The *Estrada* court noted that "FedEx's control over every exquisite detail of the drivers' performance, including the color of their socks and the style of their hair, supports the . . . conclusion that the drivers are employees, not independent contractors."  64 Cal. Rptr. 3d at 336.  This case presents similar undisputed facts

concerning Affinity's control over "every exquisite detail" of the drivers' appearance, including the "color of their socks" and "the style of their hair."[5]

Affinity also closely monitored and supervised its drivers. Each morning, Affinity required drivers to report to the warehouse, where Affinity had several offices, and attend the stand-up meeting. This requirement, as the district court correctly acknowledged, shows that Affinity exercised "some degree of control" over the drivers' start times. *See Estrada*, 64 Cal. Rptr. 3d at 337 (holding that drivers were employees in part because "drivers . . . must be at the terminal at regular times for sorting and packing as well as mandatory meetings, and they may not leave until the process is completed"). Affinity continued to monitor the drivers by inspecting their appearance and loading of their trucks; conducting "follow-alongs"; requiring that drivers call their Affinity supervisor after every two or three stops; monitoring the progress of each driver on the "route monitoring screen"; and contacting drivers if Affinity noticed drivers were running late or off course.

Finally, the provisions of the ITA and the Procedures Manual demonstrate that Affinity retained the right to control its drivers. The ITA sets out the drivers' rate of pay, allows

---

[5] The district court also erred by emphasizing that the rules regarding the drivers' appearance were "intended to ensure customer security rather than control the driver." (internal quotation marks omitted). In doing so, the district court misunderstood the *Borello* test. The district court incorporated a subjective requirement when it dismissed Affinity's appearance requirements as not motivated by Affinity's intent to control its drivers. Whether Affinity intended to control the drivers does not matter under *Borello*; what matters only is whether Affinity had the right to control the drivers' work.

Affinity to terminate drivers without cause with sixty days notice, and allows Affinity to transfer drivers to other locations.    And, as the district court recognized, the guidelines contained in the Procedures Manual "were more than mere 'suggestions.'"  The Procedures Manual outlined the above-described procedures that Affinity *required* its drivers to follow, including wearing uniforms, loading trucks, delivering goods, and reporting to Affinity after deliveries.

The district court held that Affinity did not have the right to control the details of the drivers' work almost entirely based on one fact: the drivers could hire helpers and secondary drivers.  But the district court overlooked the fact that often the reason drivers hired helpers was that they were *required to do so* by Affinity.  Further, like defendant FedEx in *Estrada*, Affinity retained ultimate discretion to approve or disapprove of those helpers and additional drivers.  *See id.* at 337.  While the district court found that approval was largely based upon neutral factors, such as background checks required under federal regulations, it is still true that the drivers did not have an unrestricted right to choose these persons, which is an "important right[] [that] would normally inure to a self-employed contractor."  *See Borello*, 769 P.2d at 408 n.9 (holding that a contract provision restricting sharefarmers' right to choose employees evidenced defendant's right to control sharefarmers).

Although Affinity did not require their drivers to obtain additional drivers, the testimony at trial indicated that the impetus for doing so came from Affinity whenever it had additional need for such drivers, rather than any desire by the drivers to profit from such hiring.  Moreover, any additional drivers were subject to the same degree of control exerted by Affinity over the drivers generally.

In any event, the district court's reliance on this factor as dispositive in light of the overwhelming evidence of Affinity's control over its drivers was error. Like *Estrada*, *Borello*, and *JKH Enterprises, Inc.*, the undisputed facts in this case show that Affinity retained all necessary control over the drivers' work. While "purporting to relinquish" some control to the drivers by making the drivers form their own businesses and hire helpers, Affinity "retained absolute overall control" over the key parts of the business. *See Borello*, 48 Cal. 3d at 355–56. This control included much more than obtaining clients and providing workers, which the *JKH Enterprises, Inc.* court found sufficient to establish right of control. 48 Cal. Rptr. 3d at 579. Affinity retained absolute control over drivers' rates, payment, routes, schedules, trucks, equipment, appearance, decision to hire helpers, choice of helpers, and the right to deal with customers. In light of *Estrada, Borello*, and *JHK Enterprises, Inc.*, the district court's contrary conclusion—that Affinity did not exercise sufficient control over the drivers' work—was in error.

We also note Affinity's relationship with its drivers is very different from the relationship between the parties in *State Compensation Insurance Fund v. Brown*, 38 Cal. Rptr. 2d 98 (Cal. Ct. App. 1995), where the California Court of Appeal found that the truck driver plaintiffs *were* independent contractors. There, the truck driver plaintiffs worked for more than one broker at a time, had "complete control over their working conditions and the manner in which a load was transported (including whether or not to hire assistants)," and were "entirely free to accept or reject an assignment without reprisal." *Id.* at 105. Unlike in *State Compensation Insurance Fund*, where the defendant's "participation is limited to offering the assignments and paying compensation upon proof of delivery," here, as described above, Affinity

regulated many details of the drivers' work, including working conditions and the manner in which drivers made their deliveries.  *See id.*

Thus, the most important factor under the *Borello* analysis—right to control—indicates overwhelmingly that the drivers were Affinity's employees.

## B.  Secondary Factors

Moreover, most of the secondary factors outlined in *Borello* also point to the conclusion that the drivers were employees.  *Borello*, 769 P.2d at 404; *see also JKH Enters., Inc.*, 48 Cal. Rptr. 3d at 579 n.14.

(1) *Distinct occupation or business*:  Although the district court recognized that the drivers would not have formed their own businesses in the absence of Affinity's requirement that they do so, the district court stated that "[r]egardless of the motive for forming their businesses . . . Plaintiffs ultimately had the ability to expand their businesses by hiring more employees, operating multiple trucks, and making managerial decisions regarding the employment and performances of the employees hired."  The district court clearly erred by not giving enough weight to the fact that Affinity required drivers to create these businesses as a condition of employment. Affinity even helped drivers set up the businesses by filling out necessary paperwork.

Moreover, in the real world, these businesses were in name only.  The drivers' only business was with Affinity because the drivers could not use their trucks for any purpose other than their work for Affinity.  Affinity admitted that it "strongly discouraged" drivers from removing trucks from

the warehouse lot overnight or on weekends. And, as the district court found, "Affinity would on occasion allow other drivers to use their trucks to make deliveries on days the drivers were not operating their trucks themselves. Plaintiffs were not compensated for this use."

(2) *Work under principal's direction or by specialist without supervision*: The district court emphasized that the drivers' work included not only driving but also the delivery and installation of the appliances, and that the delivery and installation work "requires substantial skill" and was unsupervised. But in hiring drivers, Affinity did not require special driving licenses or even any work experience; rather a driver simply had to have a driver's license, sign a work agreement, and pass a physical examination and drug test. These facts parallel *Estrada*, where the court found that FedEx drivers "need no experience to get the job in the first place and [the] only required skill is the ability to drive." 64 Cal. Rptr. 3d at 337. Moreover, as explained above, Affinity closely supervised the drivers' work through various methods. The district court therefore clearly erred when it concluded that the drivers were specialists without supervision.

(3) *Skill required*: As described above, the drivers' work did not require substantial skill.

(4) *Provision of instrumentalities, tools, and place of work*: As the district court found, "[t]he delivery truck was the main tool [that] Plaintiffs used to conduct their business." This main tool was provided by Affinity. Affinity advanced the drivers' costs of leasing and maintaining their trucks, and deducted these advances from drivers' paychecks. Affinity also required that drivers use a specific type of mobile phone,

provided the drivers with these phones, and deducted the associated monthly costs from drivers' paychecks.

The district court recognized these leasing and cost-advancing arrangements, but reasoned that under these arrangements the drivers furnished their own tools because they ultimately paid for them. We find this conclusion to be clearly erroneous. Affinity supplied the drivers with the major tools of the job by encouraging or requiring that the drivers obtain the tools from them through paid leasing arrangements. Moreover, the drivers did not *own* the trucks or cell phones, but only leased them from Affinity to perform their work for Affinity.

(5) *Method of payment*: As the district court found, the drivers were paid per delivery. The district court recognized that construing each delivery as an independent "job" would be unrealistic because jobs are typically longer-term and, here, drivers made approximately eight deliveries per day. The district court nonetheless concluded that the payment scheme was closer to "by the job" rather than "by the hour" because "[t]here were no set hours to the day, nor did each delivery take the same amount of time, even though the amount paid essentially remained the same." But the district court's findings that drivers made approximately eight deliveries per day and the amount paid to each driver "essentially remained the same," lead to the conclusion that, although labeled "by the delivery," the drivers were essentially paid by a regular rate of pay. *See Estrada*, 64 Cal. Rptr. 3d at 335 (finding that the fact that drivers "are paid weekly, not by the job" weighs in favor of employee status).

(6) *Parties' belief*: Ruiz and Affinity understood their relationship to be an independent contractor arrangement. As

the California Court of Appeal has noted, however, "the parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship." *Estrada*, 64 Cal. Rptr. 3d at 336 (citing *Borello*, 769 P.2d at 403).

(7)  *Right to terminate at will*:  As the district court concluded, the parties' mutual termination provision is consistent with either an employer-employee or independent contractor relationship.

(8) *Work part of principal's regular business*:  Affinity, by its own definition, is an "experienced and competent *home delivery* contractor [that] desires to perform *home delivery* services."  (emphasis added).  As the district court recognized, Affinity's drivers perform those very home delivery services that are the core of Affinity's regular business.  Without drivers, Affinity could not be in the home delivery business.

(9) *Length of time for performance of services*:  As the district court explained, "there was no contemplated end to the service relationship" when Affinity and the drivers signed their contracts, and drivers often stayed with Affinity for years.

Because Affinity had the right to control the details of the drivers' work, and because the totality of the secondary factors weigh in favor of the drivers, under California's *Borello* test, the drivers are employees of Affinity rather than independent contractors.

## CONCLUSION

The undisputed facts indicate that Affinity had the right to control the details of the drivers' work, and the application of the secondary factors weigh in favor of a finding that the drivers were employees. We therefore reverse the district court's decision that the drivers were independent contractors and hold that they were Affinity's employees under California law. We remand to the district court for further proceedings consistent with this disposition. Costs shall be awarded to Ruiz.

**REVERSED and REMANDED.**