Argued July 6, affirmed September 21, petition for
rehearing denied October 11, 1960

# BLAINE *v.* ROSS LUMBER COMPANY, INC.

355 P. 2d 461

*Hugh B. Collins,* Medford, argued the cause for appellant. On the brief were Collins & Redden, Medford.

*Charles W. Reames,* Medford, argued the cause and filed the brief for respondent.

Before Rossman, J., presiding, and Perry, Sloan, Goodwin and Holman, Justices.

ROSSMAN, J.

This is an appeal by the defendant from a judgment in the sum of $20,000 which the circuit court

entered in favor of the plaintiff upon the verdict of the jury. The action which gave rise to the judgment was based upon the Employers' Liability Law, ORS 654.305 to 654.335. The plaintiff, a logging truck operator, suffered injuries when a log which he was unloading at the defendant's mill fell from the truck and crushed his leg. The only assignment of error submitted by the defendant challenges the trial judge's denial of the defendant's motion for a directed verdict. However, the motion for a directed verdict was based upon several grounds.

The plaintiff was engaged in hauling logs for the Lewis Biden Logging Company. He obtained his load of logs at the logging site and hauled it over public roads to the defendant's mill which was located at Prospect. On arrival at the mill the logs were scaled and accepted. After the scaling the truck proceeded to the log dump which was 25 to 250 yards from the scaling shed, according to conflicting testimony. The evidence shows that logs are dumped from the truck into the mill pond with the aid of power-driven machinery which is operated in the manner which we will now describe. At the dump, next to the road, on the side which is away from the pond, there stands a shed which houses a winch. The latter has a drum upon which steel cable is wound and unwound. The cable is rigged from the drum to a pulley which is attached to a device known as an "A-frame" which stands in front of the shed. The "A-frame" possibly became known as such because its appearance is similar to the Capital letter "A." The cable normally hangs loose over the pulley and has a heavy steel hook at its end. The "A-frame" is slanted so that it somewhat overhangs the road. At the edge of the road, and immediately opposite to the "A-frame" there

stands a large log, known as a "brow log"; it forms a part of the log dump. Heavy steel cables are securely attached to the brow log and play an important part in lifting or rolling the logs off of the logging truck into the pond. When the truck has been placed in position for its unloading it stands between the brow log and the winch apparatus which we mentioned. As the truck stands in that position the cables that are affixed to the brow log are brought under the logs and are then hooked to the winch cable. That having been done, the cables are drawn tight under the load by means of the winch and the truck driver proceeds to unfasten the center binder chain. The center binder chain and its two companions were placed in position when the truck was loaded with its logs at the logging site. They hold the load of logs tightly together for the trip to the log dump. After the driver has unfastened the center binder chain more tension is placed on the lines and the end binders are then unfastened. If it develops in this operation that a log was improperly saddled upon the load of logs, and threatens to fall toward the driver who is on the ground and adjacent to the load, the cables will protect him. After the binder chains are unfastened, the winch cable is tightened so as to lift the load and dump it over the brow log into the pond. When the logs have been dumped the winch is used to aid in loading the truck trailer onto the body of the truck for the return trip to the logging site for another load.

The unloading process was designed to be carried out by two men: one to operate the winch machinery and another—the driver—to unfasten the binder chains. The task of operating the winch had been delegated by the defendant to Oliver Hansen. It was

also his duty to scale the logs as the trucks arrived at the plant, and this task kept him from operating the winch except at intermittent periods. Drivers testified that they sometimes waited at the log dump for periods of fifteen to forty minutes for Hansen's arrival. Since log truck drivers are paid by the load and not by the hour, they became impatient over the delay and this prompted them to form a habit of operating the winch machinery for one another or for themselves. There was ample evidence from which the jury could infer that this practice was known to the defendant. The mill superintendent, Martin, testified that he knew of the custom, but did not countenance it, and that when he heard of an incident he "got ahold of the truck drivers and chewed them out and told them never to do it again." However, several truck drivers testified that they had not been cautioned to leave the machinery alone, and there was no warning sign in the shed until after the accident. The defendant took no affirmative steps other than an occasional warning by Martin to discourage what the jury could have found was a common practice.

The accident which is the basis of this action occurred late in the afternoon. Hansen had scaled the plaintiff's logs and plaintiff had then proceeded to the log dump. There he found a driver named Smith who was hauling logs for one Charles Skeeters. The plaintiff and Smith did not know each other. Smith had dumped his load of logs, apparently by himself, and was preparing to load his trailer with the help of the winch. Plaintiff gave Smith assistance in this operation by positioning Smith's truck while Smith used the winch. Together they loaded the trailer, and then Smith proceeded to assist plaintiff in unloading his logs. Smith operated the winch, and tightened

the cable under the load as was customary. While the plaintiff was removing the front binder chain Smith came out of the winch house to remove the rear chain. As they were casting the chains aside a log rolled from the top of the stack toward the men and the winch cable gave way. Smith was killed by the falling log and the plaintiff was injured.

The accident is explained by the brake system on the winch. The cable is tightened under a load of logs by winding the excess on a drum. To prevent the drum from unwinding, a friction hand brake is used. The brake is worked by a long handle which extends at one side of the machinery. In order to set the brake securely the winch operator must pull the handle down to the floor and stand on it, putting all of his weight on the handle. There was also a rope in the shed with which the handle could be tied to the floor, thus permitting the winch operator to work elsewhere. Although the cable drum had a ratchet at one side which would permit a "dog" or positive mechanical locking mechanism to be used, no such mechanism was provided. Photographs in evidence indicate that there were two drums in the shed and that one of them—used for bringing logs out of the pond—had a positive locking device. The accident occurred because Smith, when he came out of the shed to help plaintiff release the binder chains, was not in a position to keep the brake set and had not tied the brake handle to the floor. Thus, the winch cable offered no resistance to the falling log.

Evidence shows that at the time of the accident the road which served as an unloading platform was soft and muddy. It indicates that logs struck the brow log as they were dumped and they left deposits of bark on the pond side of the road so that trucks

parked for unloading were tilted toward the winch. This presented a further hazard to the workmen.

■ The Employers' Liability Law, ORS 654.305, provides:

"Generally, all owners, contractors or subcontractors and other persons having charge of, or responsible for, any work involving a risk or danger to the employes or the public, shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices."

A right of action is given for breach of this duty. There was ample evidence in the record to support a finding that additional precautions ought to have been taken for the safety of those required to work about the unloading machinery.

■ The complaint also set forth several sections of the Safety Code for Logging and other orders and regulations promulgated by the State Industrial Accident Commission pursuant to authority granted in ORS 654.005 to ORS 654.100. The jury might have found that several of these regulations had been violated by the defendant. A violation of the Commission's orders constitutes negligence per se and may be pleaded by the plaintiff in an action under the Employers' Liability Law. *Arnold v. Gardiner Hill Timber Co.*, 199 Or 517, 263 P2d 403 (1953).

■ At the outset the defendant claims that plaintiff was an independent contractor rather than an employee of Lewis Biden Logging Company and was

thus precluded by *Helzer v. Wax,* 127 Or 427, 272 P 556 (1928) and *Saylor v. Enterprise Elec. Co.,* 106 Or 421, 212 P 477 (1923) from claiming the benefits of the Employers' Liability Law. If plaintiff was in fact an employee of Biden, then he is entitled to claim the benefit of the Act, since it has been construed to apply to employees of a person other than the defendant, if their work requires them to come within the risk of injury from the defendant's instrumentalities. *Myers v. Staub,* 201 Or 663, 272 P2d 203 (1954); *Drefs v. Holman Transfer Co.,* 130 Or 452, 280 P 505 (1929); *Rorvik v. North Pac. Lumber Co.,* 99 Or 58, 190 P 331, 195 P 163 (1920); *McKay v. Pacific Bldg. Materials Co.,* 156 Or 578, 68 P2d 127 (1937).

■ The only evidence as to the nature of the employment relationship was supplied by the plaintfif. The uncontradicted testimony shows that plaintiff owned his own truck and paid all expenses connected with its operation and maintenance. He could hire a driver, though apparently only with Biden's consent. The plaintiff would have to pay the salary of any driver he hired. Biden could discharge the plaintiff at will and did in fact discharge a substitute driver the plaintiff had hired while incapacitated by his injury. Biden set the hours that plaintiff worked. Biden directed plaintiff's operations at the logging site and selected the logs to be loaded. However, plaintiff could insist that the logs be properly stacked and that the total weight be kept within legal limits. Biden directed plaintiff where to take the logs. On four occasions within the four or five months preceding the accident plaintiff hauled single loads of logs for others than Biden. Log truck drivers do not receive wages but are compensated on the basis of thousands of board feet hauled.

This court has ruled that a logging truck operator is an employee of the logger for purposes of the Workmen's Compensation Act, ORS Chapter 656, in a case where the facts were virtually identical to those stated above. *Bowser v. State Industrial Accident Commission,* 182 Or 42, 185 P2d 891 (1947). Biden had made an election, pursuant to ORS 656.024, to accept the Workmen's Compensation Act and no doubt relying upon our decision in the Bowser case made deductions from the plaintiff's wages and contributed to the Industrial Accident Fund. The defendant, on the other hand, although engaged in what the Act defines as a "hazardous occupation," ORS 656.084 (3), rejected the benefits of the Act and thereby had the obligation to supply its own protection against (1) suits brought under the Employers' Liability Law with its high standard of care and comparative negligence provisions or (2) suits brought under ORS .656.024, where many of the common law defenses are denied to the employer. See Stunz, Interrelation of the Employers' Liability Law and Workmen's Compensation, 1 Willamette L J 17 (1959).

We hold that the plaintiff was an employee of Biden.

■ The trial court instructed the jury:

"You are instructed that before the plaintiff will be entitled to a verdict at your hands, you must first find that he was an employe of Lewis Biden as alleged in the complaint. If you find that he was an independent contractor and not an employe, then the defendant would be entitled to a verdict at your hands."

The court then instructed upon the general principles which distinguish employees from independent con-

tractors. Certainly the defendant can not complain of this submission since, in our opinion, the question should not have been given to the jury at all. The plaintiff's testimony concerning the details of his employment was undisputed.

■ The defendant next contends that plaintiff is barred from bringing the action by ORS 656.154, a section of the Workmen's Compensation Act governing third party actions. That section provides:

> "If the injury to a workman is due to the negligence or wrong of a third person not in the same employ, the injured workman, or if death results from the injury, his widow, children or other dependents, as the case may be, may elect to seek a remedy against such third person. However, no action shall be brought against any such third person if he or his workman causing the injury was, at the time of the injury, on premises over which he had joint supervision and control with the employer of the injured workman and was an employer subject to ORS 656.002 to ORS 656.590 [Workmen's Compensation Act]."

Biden, as we have noted, had elected to accept the Act. The defendant had rejected it, but argues that it was "subject to ORS 656.002 to ORS 656.590" and that this action is barred because the defendant and Biden had "joint supervision and control" over the premises where the accident occurred.

This contention is without merit. We need not consider whether there was "joint supervision and control" or whether other elements necessary to defeat a third party action were present because we think it is clear that ORS 656.154 is a bar only if the plaintiff's employer and the third party have both elected to accept the benefits of the act and pay contributions into the Industrial Accident Fund. The

defendant apparently argues that "subject to ORS 656.002 to 656.590" should be understood in a broad sense as including any employer engaged in a hazardous occupation who is affected by the act whether he accepts or rejects its benefits. See ORS 656.022. Taken entirely out of context, this is a plausible reading. But it is clear from a reading of the act as a whole that "subject to ORS 656.002 to 656.590" is used with reference to employers who have elected to accept the benefits of the act by contributing to the fund. The phrase "subject to ORS 656.002 to 656.590" is used in a number of sections in such a context as to make it clear that the authors were referring only to employers who elect to come under the act, and not to all employers engaged in hazardous occupations generally. See, for example, ORS 656.026, 656.034, 656.036, 656.122 to 656.132, 656.152. Moreover, ORS 656.024 provides that an employer who elects to reject the act is "entitled to none of the benefits of ORS 656.002 to 656.590." Immunity from suit by the employee of another must surely be considered such a benefit. See also, ORS 656.022.

There is no reason why the legislature would have granted the exemption from liability claimed by the defendant here. The exemption protects employers only in the limited situation where there is such a commingling of different employers and employees on a common job that to preserve the common law right of action would defeat the benefits which an employer could reasonably expect to obtain by his participation in the Workmen's Compensation Fund. The view we adopt is supported by *Brown v. Underwood Lumber Co.,* 172 Or 261, 141 P2d 527 (1943). See also, *Johnson v. Timber Structures,* 203 Or 670, 281 P2d 723 (1955); *Claussen v. Ireland,* 216 Or 289, 338 P2d 676 (1959).

As a further ground of error the defendant asserts that the accident was due solely to the negligence of Smith, or of Smith and the plaintiff acting in concert. The defendant does not contend that the unloading machinery conformed to statutory standards of safety, but rather that Smith and the plaintiff were volunteers and that their negligence was an independent intervening cause of the accident.

■■ The defendant's failure to furnish safe machinery was a contributing cause of the accident and hence the jury was entitled to find that it was a "proximate" cause. *Woods v. Wikstrom,* 67 Or 581, 135 P 192 (1913). There was evidence from which one might infer that a custom had developed for drivers to operate the winch. While the company may not have approved, it took no active steps to stop the practice (1) by posting signs, (2) by locking the machinery or (3) by stationing a man permanently at the unloading platform. Smith apparently had been warned by the plant superintendent not to unload his own truck, but the plaintiff testified that he himself had received no such admonition and that he was not aware the practice was forbidden. The custom of having truck drivers unload their own logs was beneficial to the defendant. Furthermore, the defendant must have realized that these drivers, in the absence of clear-cut warning or supervision, would undertake self help and the risk involved in permitting untrained personnel to handle defective machinery was neither remote nor unforeseeable. The Employers' Liability Law does not contemplate merely that machinery shall conform to standards of safety if used in a particular way, but that it shall be safe for all uses to which it is customarily put. *Campbell v. Southern Pacific Co.,* 120 Or 122, 250 P 622 (1926).

■ On this question the trial judge instructed the jurors as follows:

"The plaintiff would not be entitled to recover in this case unless you first find that there was at that time a custom and usage known to the defendant whereby the truck drivers of the trucks delivering logs to the defendant were permitted by the defendant to unload their trucks in the absence of any authorized employees of the defendant, and that that custom, if any, was a benefit to the defendant. This is a question of fact for you to determine."

We believe that the trial judge correctly stated the law, and the jury resolved these issues in favor of the plaintiff.

■ Finally, the defendant suggests that the plaintiff was a vice-principal, arguing that plaintiff's duty to release the binder chains holding his load of logs implied a duty to make sure that all safety measures incident to this task were carried out. We have held that a vice-principal can not maintain an action for injuries incurred by his own failure to carry out duties delegated to him by his employer. *Howard v. Foster & Kleiser*, 217 Or 516, 332 P2d 621, 342 P2d 780 (1958); *Galer v. Weyerhaeuser Timber Co.*, 218 Or 152, 344 P2d 544 (1959). However, the evidence here is conclusive that plaintiff did not have a duty to inspect or repair the winch machinery.

Affirmed.