**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EDWARD SLAYMAN; DENNIS
MCHENRY; JEREMY BRINKER; JON
LEIGHTER; DAVID SPICER,
individually and on behalf of all
others similarly situated,
          *Plaintiffs-Appellants*,

          v.

FEDEX GROUND PACKAGE
SYSTEM, INC., DBA Fedex Home
Delivery, Inc.,
          *Defendant-Appellee*.

No. 12-35525

D.C. Nos.
3:05-cv-01127-HZ
3:07-cv-00818-HZ

OPINION

EDWARD SLAYMAN; DENNIS
MCHENRY; JEREMY BRINKER; JON
LEIGHTER; DAVID SPICER,
individually and on behalf of all
others similarly situated,
          *Plaintiffs-Appellees*,

          v.

FEDEX GROUND PACKAGE
SYSTEM, INC., DBA Fedex Home
Delivery, Inc.,
          *Defendant-Appellant*.

No. 12-35559

D.C. Nos.
3:05-cv-01127-HZ
3:07-cv-00818-HZ

Appeal from the United States District Court
for the District of Oregon
Marco A. Hernandez, District Judge, Presiding

Argued and Submitted
March 6, 2014—Portland, Oregon

Filed August 27, 2014

Before: Alfred T. Goodwin, Stephen S. Trott,
and William A. Fletcher, Circuit Judges.

Opinion by Judge W. Fletcher

## SUMMARY[*]

### Oregon Law

The panel reversed the Multidistrict Litigation Court's grant of summary judgment to FedEx Ground Package System, Inc., its denial of plaintiff FedEx drivers' motion for partial summary judgment, and its certification of plaintiffs' classes insofar as they sought prospective relief in two class actions alleging that FedEx drivers in Oregon were employees rather than independent contractors.

The panel held under Oregon law that plaintiff FedEx drivers were employees as a matter of law under both the right-to-control and economic-realities tests. The panel

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

remanded to the district court with instructions to enter summary judgment for plaintiffs on the question of employment status. The panel also held that one of the classes lacked Article III standing to seek prospective relief, and the other class's claims for prospective relief became moot before the Multidistrict Litigation Court certified the class.

---

**COUNSEL**

Mark. A. Friel, Steve Douglas Larson, Scott Alden Shorr (argued), Stoll Berne, Portland, Oregon, for Plaintiffs-Appellants/Cross-Appellees.

Jonathan Hacker (argued), O'Melveny & Myers LLP, Washington, D.C.; Anton Metlitsky, O'Melveny & Myers LLP, New York, New York; Robert Schwartz and Scott Voelz, O'Melveny & Myers LLP, Los Angeles, California, for Defendant-Appellee/Cross-Appellant.

Richard Pianka, Arlington, Virginia, for Amici Curiae American Trucking Associations, Inc. and Oregon Trucking Associations, Inc.

---

**OPINION**

W. FLETCHER, Circuit Judge:

As a central part of its business, FedEx Ground Package System, Inc. ("FedEx"), contracts with drivers to deliver packages to its customers. The drivers must wear FedEx uniforms, drive FedEx-approved vehicles, and groom

themselves according to FedEx's appearance standards. FedEx tells its drivers what packages to deliver, on what days, and at what times. Although drivers may operate multiple delivery routes and hire third parties to help perform work on those routes, they may do so only with FedEx's consent.

FedEx contends its drivers are independent contractors under Oregon law. Plaintiffs, two classes of FedEx drivers in Oregon, contend they are employees. We agree with plaintiffs.

## I.  Background

### A.  Factual Background

Named plaintiffs, former FedEx drivers, represent two classes comprising approximately 363 individuals who were full-time delivery drivers for FedEx in Oregon at any time between 1999 and 2009. Plaintiff class members worked for FedEx's two operating divisions, FedEx Ground and FedEx Home Delivery. FedEx Ground deals primarily with business-to-business deliveries, while FedEx Home Delivery deals primarily with residential deliveries. The differences between the two divisions do not matter to this appeal.

FedEx characterizes its drivers as independent contractors. FedEx's Operating Agreement ("OA") governs its relationship with the drivers. The OA's "Background Statement" provides:

> [T]his Agreement will set forth the mutual business objectives of the two parties . . . but the manner and means of reaching these

results are within the discretion of the [driver], and no officer or employee of FedEx . . . shall have the authority to impose any term or condition on [the driver] . . . which is contrary to this understanding.

A provision of the OA, titled "Discretion of Contractor to Determine Method and Means of Meeting Business Objectives," states:

[N]o officer, agent or employee of FedEx . . . shall have the authority to direct [the driver] as to the manner or means employed . . . . For example, no officer, agent or employee of FedEx . . . shall have the authority to prescribe hours of work, whether or when the [driver] is to take breaks, what route the [driver] is to follow, or other details of performance.

FedEx's relationship with its drivers also is governed by various policies and procedures prescribed by FedEx.

### 1. Job Requirements

The OA requires FedEx drivers to pick up and deliver packages within their assigned "Primary Service Area[s]." Drivers must deliver packages every day that FedEx is open for business and must deliver every package they are assigned each day. They must deliver each package within a specific window of time negotiated between FedEx and its customers. After each delivery, drivers must use an electronic scanner to send data about the delivery to FedEx. FedEx does not require drivers to follow specific delivery routes. However, FedEx tells its managers to design and recommend to its

drivers routes that will "reduce travel time" and "minimize expenses and maximize earnings and service."

FedEx does not expressly dictate working hours, but it structures drivers' workloads to ensure that they work between 9.5 and 11 hours every working day. If a driver's manager determines that the driver has more work than he or she "can reasonably be expected to handle" in a 9.5- to 11-hour day, the manager may reassign part of the driver's workload to other drivers. Drivers are compensated according to a somewhat complex formula that includes per-day and per-stop components. Drivers are expected to arrive at their delivery terminals each morning, and they are not supposed to leave the terminal until all of their packages are available for pick-up. FedEx instructs managers to make sure that drivers properly fill out their paperwork and prepare their packages for delivery. Each terminal sets a time by which all drivers must return at the end of the day. If drivers want their trucks loaded by FedEx's package-handlers, they must leave their trucks at the terminal overnight.

The OA gives FedEx the authority to "reconfigure" a driver's service area upon five days' written notice. Drivers have the right to propose a plan to avoid reconfiguration, "using means satisfactory to FedEx." FedEx "may, in its sole discretion," reject a plan that does not "provide reasonable means to continue" the driver's service area. Should a driver's service area be reconfigured in such a way that the driver gains customers, FedEx may reduce that driver's pay to compensate other drivers who lost customers in the reconfiguration.

FedEx trains its drivers on how best to perform their job and to interact with customers. The OA provides that, during

the first 30 days of the contract term, FedEx "shall . . . familiarize [drivers] with various quality service procedures developed by FedEx." The OA requires drivers to conduct themselves "with integrity and honesty, in a professional manner, and with proper decorum at all times." They must "[f]oster the professional image and good reputation of FedEx."

A driver's managers may conduct up to four ride-along performance evaluations each year, "to verify that [the driver] is meeting the standards of customer service" required by the OA. Managers are supposed to observe and record small details about each step of a delivery, including whether a driver uses a "dolly or cart" to move packages, demonstrates a "sense of urgency," and "[p]laces [his or her] keys on [the] pinky finger of [his or her] non-writing hand" after locking the delivery vehicle. After finishing a ride-along evaluation, managers are supposed to give immediate feedback to drivers about the quality of their work. FedEx contends in this litigation that this feedback constitutes mere recommendations that drivers are free either to follow or disregard.

Drivers must follow FedEx's "Safe Driving Standards." These standards prohibit illegal conduct such as "[d]riving while under the influence of alcohol or drugs" and "[u]sing a motor vehicle in the commission of a felony." They also forbid some legal conduct, including "driving a motor vehicle in a speed exhibition, contest or drag race" and "[c]arrying passengers not authorized by FedEx."

The OA allows drivers to operate more than one vehicle and route, but only "with the consent of FedEx" and only if "consistent with the capacity of the [driver's] terminal."

Drivers may also hire third parties to help perform their work. Third-party helpers must be "qualified pursuant to applicable federal, state and municipal safety standards and [FedEx's] Safe Driving Standards." They must be "fully trained" and must "conform fully" with the OA. Drivers "in good standing" under the OA may assign their rights and obligations to replacement drivers, but any such replacement must be "acceptable to FedEx."

Drivers enter into the OA for an initial term of one, two, or three years. At the end of the initial term, the OA provides for automatic renewal for successive one-year terms if neither party provides notice of their intent not to renew. The OA may be terminated (1) by the parties' mutual agreement; (2) for cause, including a breach of any provision of the OA; (3) if FedEx stops doing business or reduces operations in all or part of the driver's service area; or (4) upon thirty days' written notice by the driver. The OA requires drivers to submit claims for wrongful termination to arbitration.

2. Equipment and Appearance Requirements

FedEx requires its drivers to provide their own vehicles. Vehicles must not only meet "all applicable federal, state and municipal laws and regulations," but also must be specifically approved by FedEx. The OA allows FedEx to dictate the "identifying colors, logos, numbers, marks and insignia" of the vehicles. All vehicles must be painted "FedEx white," a specific shade of Sherwin-Williams paint, or its equivalent. They must be marked with the FedEx logo and "maintained in a clean and presentable fashion free of body damage and extraneous markings." FedEx requires vehicles to have specific dimensions, and all vehicles must also contain

shelves with specific dimensions. FedEx requires that a "typical package van" have

> two [shelves] per side, full length of the body. They should be 24" (-1", +3") deep with a 1" to 2" pitch and a front lip not to exceed 2" height. Top shelf to bottom of roof or roof bow should be 24" minimum. The lower shelf lip to the bottom of the top shelf should be 24" (+/- 3/4"). Aluminum is the preferred material, however marine grade plywood is acceptable.

Managers may refuse to let drivers work if their vehicles do not meet these requirements.

Drivers must provide maintenance at their own expense and must "bear all costs and expenses incidental to operation" of the vehicle. Drivers authorize FedEx to pay for vehicle licensing, taxes, and fees, and to deduct these costs from the drivers' pay. The OA gives FedEx

> such exclusive possession, use, and control of the [vehicle as] required by . . . applicable regulations, but [FedEx] shall have no right or authority . . . to operate the [vehicle] for any purpose (except for incidental yard movement and positioning) unless the [vehicle] is driven either by [the driver] or by an operator engaged by [the driver].

The OA requires that while vehicles are "in the service of FedEx," they must be used "exclusively for the carriage of the goods of FedEx . . . and for no other purpose." Drivers

may use their vehicles "for other commercial or personal purposes when [they are] not in the service of FedEx," but only if all "identifying numbers, marks, logos and insignia" are removed or covered.

FedEx offers a "Business Support Package," which provides drivers with uniforms, scanners, and other necessary equipment. FedEx deducts the cost of the equipment from drivers' pay. Purchase of the package is ostensibly optional, but more than 99 percent of drivers purchase it. The scanners that drivers must use to send delivery information to FedEx are not readily available from any other source.

The OA requires drivers to comply with personal-appearance standards and to wear a FedEx uniform "maintained in good condition." The required uniform includes a uniform shirt with the FedEx logo, uniform pants or shorts, dark shoes and socks, and, if the driver chooses to wear a jacket or cap, a uniform jacket and cap with the FedEx logo. Drivers must keep their "personal appearance consistent with reasonable standards of good order as . . . promulgated from time to time by FedEx." Drivers must be "clean shaven, hair neat and trimmed, free of body odor." Managers may refuse to let drivers work if they are improperly dressed or groomed.

## B.  Procedural History

This consolidated appeal involves two class actions originally filed in the District of Oregon: *Slayman v. FedEx Ground Package System*, No. 12-35525, and *Leighter v. FedEx Ground Package System*, No. 12-35559. The basis for both cases is plaintiffs' claim that "FedEx improperly classified its drivers as independent contractors, thereby

forcing them to incur business expenses and depriving them of benefits otherwise owed to employees" under Oregon law. Except where the differences matter to our holding, we do not distinguish between the two cases.

The *Slayman* plaintiffs brought claims for (1) illegal deductions from wages under Or. Rev. Stat. § 652.610, (2) fraud, (3) rescission of the OA, and (4) declaratory relief. The *Leighter* plaintiffs brought claims for (1) illegal deductions from wages under Or. Rev. Stat. § 652.610, (2) rescission of the OA, (3) declaratory relief, (4) injunctive relief, (5) unpaid overtime under Or. Rev. Stat. § 653.261 and Or. Admin. R. 839-020-0030, and (6) unpaid wages. The named plaintiffs in *Slayman* are Edward Slayman, Dennis McHenry, and Jeremy Brinker. The named plaintiffs in *Leighter* are Jon Leighter and David Spicer. All the named plaintiffs except Leighter had stopped driving for FedEx before the complaints were filed. Leighter stopped driving for FedEx two months after the *Leighter* complaint was filed.

Between 2003 and 2009, similar cases were filed against FedEx in approximately forty states. The Judicial Panel on Multidistrict Litigation consolidated these FedEx cases, including *Slayman* and *Leighter*, for multidistrict litigation ("MDL") proceedings in the District Court for the Northern District of Indiana ("the MDL Court"). Plaintiffs moved for class certification. They represented to the MDL Court that their claims would rely only on "common proof applicable to members of the class as whole." The MDL Court certified classes in both *Slayman* and *Leighter*, except for plaintiffs' claims for rescission of the OA. The MDL Court certified the *Slayman* plaintiffs' damages claim under Federal Rule of Civil Procedure 23(b)(3) and their claim for declaratory relief under Rule 23(b)(2). The MDL Court certified the *Leighter*

plaintiffs' damages claims as two subclasses under Rule 23(b)(3) and their claims for injunctive and declaratory relief under Rule 23(b)(2).

Plaintiffs in all the MDL cases moved for partial summary judgment, seeking to establish their status as employees as a matter of law. In most cases, FedEx cross-moved for summary judgment. However, FedEx did not move for summary judgment in either *Slayman* or *Leighter*. The MDL Court denied nearly all of the MDL plaintiffs' motions for summary judgment and granted nearly all of FedEx's motions. In *Slayman* and *Leighter*, the MDL Court granted summary judgment sua sponte to FedEx, holding that plaintiffs were independent contractors as a matter of law.

The MDL Court remanded *Slayman* and *Leighter* to the district court to resolve the drivers' rescission claims, for which class certification had not been granted. The district court granted summary judgment to FedEx on those claims and entered final judgment. Plaintiffs timely appealed, challenging only the MDL Court's denial of their partial motion for summary judgment and its grant of summary judgment to FedEx. FedEx conditionally cross-appealed, arguing that if we reverse the MDL Court's grant of summary judgment to FedEx, we should also reverse the MDL Court's class-certification decisions.

## II. Standard of Review

We review de novo the district court's decision whether to grant summary judgment, viewing the facts in the light most favorable to the non-moving party. *Fichman v. Media Ctr.*, 512 F.3d 1157, 1159 (9th Cir. 2008). "A grant of summary judgment is appropriate when 'there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (en banc) (quoting Fed. R. Civ. P. 56(a)). We review the district court's class-certification decisions for abuse of discretion. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011).

### III. Discussion

#### A. Certification to the Oregon Supreme Court

As an initial matter, plaintiffs request that we certify the question of their status to the Oregon Supreme Court. We decline to do so "because 'controlling precedent' is available to guide us." *Fields v. Legacy Health Sys.*, 413 F.3d 943, 958 (9th Cir. 2005) (citation omitted). This case does not raise an unsettled question of substantive state law. It simply requires us to apply legal tests that Oregon courts have applied many times in prior cases. *See Kremen v. Cohen*, 325 F.3d 1035, 1037 (9th Cir. 2003).

#### B. Summary Judgment on Employment Status

The MDL Court granted summary judgment to FedEx, holding that plaintiffs are independent contractors as a matter of law. Plaintiffs argue that, at a minimum, summary judgment for FedEx was inappropriate. They argue further that the district court should have granted their motion for partial summary judgment because they are employees as a matter of law. We agree that plaintiffs are employees as a matter of law. Accordingly, we reverse the MDL Court and remand to the district court with instructions to enter summary judgment for plaintiffs on the question of employment status.

The parties agree that Oregon law controls this dispute. Plaintiffs' claims under Or. Rev. Stat. § 652.610 are governed by Oregon's right-to-control test.  *See Cejas Commercial Interiors, Inc. v. Torres-Lizama*, 316 P.3d 389, 396 (Or. Ct. App. 2013).   The *Leighter* plaintiffs' claims for unpaid overtime under Or. Rev. Stat. § 653.261 and Or. Admin. R. 839-020-0030 are governed by Oregon's economic-realities test.  *Id.* at 397.

We conclude that summary judgment for plaintiffs is appropriate in this case.  The facts are largely undisputed. FedEx and plaintiffs agree that their working relationship is controlled by the OA and FedEx's policies and procedures. They dispute only the extent to which those documents give FedEx the right to control its drivers.  In Oregon, the meaning of a contract such as the OA is a question of law, unless it is ambiguous and there is "competing extrinsic evidence" from which a jury could resolve the ambiguity in favor of either party.  *Dial Temp. Help Serv., Inc. v. DLF Int'l Seeds, Inc.*, 298 P.3d 1234, 1236–37 (Or. Ct. App. 2013).  Here, much of the OA is not ambiguous.  To the extent it is ambiguous, the extrinsic evidence supports a conclusion that FedEx has the right to control its drivers.  Viewing the evidence in the light most favorable to FedEx, we conclude that plaintiffs are employees under both the right-to-control and economic-realities tests.

### 1.  Right-to-Control test

Oregon's right-to-control test requires courts to weigh four factors: "(1) direct evidence of the right to, or exercise of, control; (2) the furnishing of tools and equipment; (3) the method of payment; and (4) the right to fire."  *Stamp v. Dep't of Consumer & Bus. Servs.*, 9 P.3d 729, 731 (Or. Ct. App.

2000). We address each factor in turn, considering only evidence applicable to all class members.

### a. Direct Evidence of the Right to Control

Direct evidence of the right to control is the most important factor under Oregon law. *See Great Am. Ins. Co. v. Gen. Ins. Co. of Am.*, 475 P.2d 415, 418 (Or. 1970); *Stamp*, 9 P.3d at 734–35. FedEx argues that the OA creates an independent-contractor relationship. Oregon law is clear that a contract's recitation of an independent-contractor relationship is not dispositive. *See Schaff v. Ray's Land & Sea Food Co.*, 45 P.3d 936, 941 (Or. 2002); *Wallowa Valley Stages, Inc. v. Oregonian Publ'g Co.*, 386 P.2d 430, 433 (Or. 1963). What matters is what the contract, in actual effect, allows or requires. *See Jenkins v. AAA Heating & Cooling, Inc.*, 421 P.2d 971, 972 (Or. 1966). The OA and FedEx's policies and procedures unambiguously allow FedEx to exercise a great deal of control over the manner in which its drivers do their jobs. Therefore, this factor strongly favors plaintiffs.

First, FedEx can and does control the appearance of its drivers and their vehicles. FedEx controls its drivers' clothing from their hats down to their shoes and socks. It requires drivers to be "clean shaven, hair neat and trimmed, [and] free of body odor." FedEx's detailed appearance requirements clearly constitute control over its drivers. *Cf. Ruiz v. Affinity Logistics Corp.*, No. 12-56589, 2014 WL 2695534, at *7 (9th Cir. June 16, 2014) (finding right to control under California law where a delivery company controlled "'every exquisite detail' of the drivers' appearance, including the 'color of their socks' and 'the style of their hair'"); *Huggins v. FedEx Ground Package Sys., Inc.*,

592 F.3d 853, 859 (8th Cir. 2010) (holding, under Missouri law, that FedEx's appearance requirements "show the extent of FedEx's control" over drivers' work). Further, FedEx requires drivers to paint their vehicles a specific shade of white, to attach FedEx decals, and to keep their vehicles "clean and presentable [and] free of body damage and extraneous markings." These requirements go well beyond those imposed by federal regulations. *See* 49 C.F.R. § 390.21. FedEx dictates the vehicles' dimensions, including the dimensions of their "package shelves" and the materials from which the shelves are made. Managers may prevent drivers from working if they are improperly dressed or groomed, or if their vehicles do not meet specifications.

Second, FedEx can and does control the times its drivers can work. The OA does not allow FedEx to set its drivers' specific working hours down to the last minute, but it is clear from the OA that FedEx has a great deal of control over their hours. FedEx structures drivers' workloads so that they have to work 9.5 to 11 hours every working day. FedEx argues that, because drivers can hire helpers to do their work for them, they are free to complete a full day's work in less than 9.5 hours. But managers may adjust drivers' workloads to ensure that they never have more or less work than can be done in 9.5 to 11 hours. Drivers are not supposed to leave their terminals in the morning until all of their packages are available, and they must return to the terminals no later than a specified time. If drivers want their vehicles loaded, they must leave them at the terminal overnight. The combined effect of these requirements is substantially to define and constrain the hours that FedEx's drivers can work. *See Bowser v. State Indus. Accident Comm'n*, 185 P.2d 891, 895, 899 (Or. 1947) (finding employee status where a log-hauler

could not load his truck before or after the time when the employer's loading crew arrived or left).

Third, FedEx can and does control aspects of how and when drivers deliver their packages. It assigns each driver a specific service area, which it "may, in its sole discretion, reconfigure." It tells drivers what packages they must deliver and when. It negotiates the time window for deliveries directly with its customers. *Compare Salem Decorating Ctr., Inc. v. Nat'l Council on Comp. Ins.*, 840 P.2d 739, 742 (Or. Ct. App. 1992) (finding that installers were employees where their employer negotiated contracts with customers), *with Pam's Carpet Serv., Inc. v. Emp't Div.*, 613 P.2d 52, 55 (Or. Ct. App. 1980) (finding that installers who "negotiate[d] directly with the customer" were independent contractors). The OA requires drivers to comply with "standards of service," including requirements to "[f]oster the professional image and good reputation of FedEx" and to "conduct all business activities with . . . proper decorum at all times."

FedEx notes that there are details of its drivers' work that it does not control. For instance, it does not require drivers to follow specific routes or to deliver packages in a specific order. Taking the evidence in the light most favorable to FedEx, it does not require drivers to follow managers' recommendations after ride-along evaluations. But the right-to-control test does not require absolute control. *See Rubalcaba v. Nagaki Farms, Inc.*, 43 P.3d 1106, 1109 (Or. 2002) (noting that the Oregon Supreme Court has found employee status despite "mixed" evidence of control); *Castle Homes, Inc. v. Whaite*, 769 P.2d 215, 217 (Or. Ct. App. 1989) (finding employee status where the employer "did not, in fact, exercise control over many of the details of [the employee's] work, [but] did exercise control in certain significant

respects"). FedEx's lack of control over some parts of its drivers' jobs does not counteract the extensive control it does have the right to exercise.

FedEx argues that it controls its drivers only with respect to the results it seeks, not the manner in which drivers achieve those results. *See Great Am. Ins. Co.*, 475 P.2d at 417 ("The test of right to control does not refer to the right to control the results of the work but rather to the right to control the manner and means of accomplishing the result."). We agree with FedEx that "results," reasonably understood, refers in this context to timely and professional delivery of packages. Some but not all of FedEx's requirements go to the "results" of its drivers' work so understood. Most obviously, no reasonable jury could find that the "result" sought by FedEx includes "every exquisite detail" of the delivery driver's fashion choices and grooming. *Ruiz*, 2014 WL 2695534, at *7; *see id.* n.5. And no reasonable jury could find that the "results" FedEx seeks include having all of its vehicles containing shelves built to exactly the same specifications. Other aspects of FedEx's control—such as limiting drivers to a specific service area with specific delivery locations—also are not merely control of results under Oregon law.

In *Bowser*, the Oregon Supreme Court found that "a log hauler furnishing his own truck and hauling logs for [a logging] company" was an employee of the company. 185 P.2d at 891–92. The court emphasized that the company told its haulers to deliver specific loads to specific locations. It held that the company's control over "what load [its drivers] are going to take . . . strongly tends to establish the relationship of employer and employee." *Id.* at 898. The Oregon Supreme Court reaffirmed *Bowser* in *Rubalcaba*, which involved a hauler who transported vegetables for a

farmer. The hauler owned his own truck and could work for other farms. 43 P.3d at 1107–08. Nevertheless, the court held that the farmer had the right to control the hauler, finding the case "virtually identical" to *Bowser*. *Id.* at 1111. The farmer "exercised a degree of control over the system for loading its product into the trucks." *Id.* The farmer's "harvesting crew" loaded haulers' trucks and "directed . . . haulers to the field that was being harvested and indicated where to take the produce that had been loaded." *Id.* (internal quotation marks omitted). The court wrote, "As in *Bowser*, there [is] no suggestion that [the hauler] here had any choice over which load he was going to take." *Id.*

In contrast to the facts in *Bowser* and *Rubalcaba*, a heating company's salespeople in *Jenkins* "were free to keep such hours, work such territory, and make as many or as few calls as they saw fit." 421 P.2d at 972. The Oregon Supreme Court held on these facts that the salespeople were independent contractors. *Id.* Similarly, the Oregon Supreme Court held in *Schaff* that a company's salespeople were independent contractors where they "determin[ed] when and how to work" and "selected and established their own routes." 45 P.3d at 938; *see also Avanti Press, Inc. v. Emp't Dep't Tax Section*, 274 P.3d 190, 192 (Or. Ct. App. 2012) (holding that a saleswoman was an independent contractor where she "set her own work schedule and decided how frequently to visit customers").

FedEx treats its drivers more like the haulers in *Bowser* and *Rubalcaba* than like the salespeople in *Jenkins* and *Schaff*. FedEx requires its drivers to load and unload packages at FedEx terminals every working day. It assigns each driver a specified service area and tells drivers where in their service area to deliver packages. As in *Bowser* and

*Rubalcaba*, FedEx drivers have no control over which packages they deliver. This "strongly tends to establish the relationship of employer and employee." *Rubalcaba*, 43 P.3d at 1111 (quoting *Bowser*, 184 P.2d at 898) (internal quotation marks omitted); *see also Stamp*, 9 P.3d at 731 (finding right to control where the employer "directed when and where" the employee worked); *HDG Enters. v. Nat'l Council on Comp. Ins.*, 856 P.2d 1037, 1040 (Or. Ct. App. 1993) (holding that providing "work orders, blueprints and specifications" was control over the manner of floor installers' work (emphasis omitted)).

Like the Oregon Supreme Court in *Bowser* and *Rubalcaba*, we can find "no difference at all between [FedEx drivers'] actual situation in so far as control is concerned and the situation of one hired to drive a [delivery] truck . . . owned and operated by [FedEx]." *Rubalcaba*, 43 P.3d at 1109 (quoting *Bowser*, 185 P.2d at 898) (internal quotation marks omitted). According to FedEx, the primary difference is that it gives drivers "entrepreneurial opportunities"—the ability to take on multiple routes and vehicles and to hire third-party helpers—that are inconsistent with employee status. FedEx relies not on Oregon law for this argument, but on the D.C. Circuit's decision in *FedEx Home Delivery v. National Labor Relations Board*, 563 F.3d 492 (D.C. Cir. 2009). In *FedEx Home Delivery*, a divided panel of the D.C. Circuit reversed an agency decision that FedEx drivers were employees. *Id.* at 495. The majority "shift[ed the] emphasis away from the unwieldy control inquiry," asking instead "whether the putative independent contractors have significant entrepreneurial opportunity for gain or loss." *Id.* at 497 (alteration in original) (internal quotation marks omitted). It held that the evidence "favoring a finding the

[drivers] are employees [was] clearly outweighed by evidence of entrepreneurial opportunity." *Id.* at 504.

The D.C. Circuit's decision in *FedEx Home Delivery*, even if correct, has no bearing on this case. There is no indication that Oregon has replaced its longstanding right-to-control test with the new entrepreneurial-opportunities test developed by the D.C. Circuit. Instead, Oregon cases indicate that entrepreneurial opportunities do not undermine a finding of employee status when a company must consent to its workers' exercise of those opportunities. In *Blaine v. Ross Lumber Co.*, 355 P.2d 461 (Or. 1960), the Oregon Supreme Court found that the plaintiff was an employee where he "could hire a driver, though apparently only with [the employer's] consent." *Id.* at 465. And in *Collins v. Anderson*, 596 P.2d 1001 (Or. Ct. App. 1979), the Oregon Court of Appeals found that a worker was an employee where his choice of helper was "subject to the approval of the employer." *Id.* at 1003; *cf. Or. Drywall Sys., Inc. v. Nat'l Council on Comp. Ins.*, 958 P.2d 195, 197–98 (Or. Ct. App. 1998) (finding a general contractor had no right to control subcontractors who "were free to hire their own workers" without the contractor's consent).

The entrepreneurial opportunities available to FedEx's drivers are equivalent to those in *Blaine* and *Collins*. The OA allows drivers to operate more than one vehicle or route only if FedEx consents, and only if doing so is "consistent with the capacity of the [driver's] terminal." Drivers must be "in good standing" in order to assign their contractual rights, and any replacement driver must be "acceptable to FedEx." Nothing in the OA limits FedEx's discretion to withhold consent to additional vehicles or routes, or to decide whether a replacement driver is "acceptable." James Primm, a Division

Vice President for FedEx, testified in his deposition that any driver seeking to use a helper must get approval to do so. Similarly, Daniel Sullivan, FedEx's founder and CEO until January 2007, testified in his deposition that FedEx may refuse to let a driver take on additional routes or sell his route to a third party. Whether FedEx ever exercises its right of refusal is irrelevant; what matters is that the right exists. *See Jenkins*, 421 P.2d at 973 ("As long as [the right to control] exists, it is of no consequence that the employer may not have exercised it.").

### b.  Other Factors

In light of the powerful evidence of FedEx's right to control its drivers, none of the remaining right-to-control factors sufficiently favors FedEx to allow a holding that plaintiffs are independent contractors. *See Great Am. Ins. Co.*, 475 P.2d at 418 (identifying evidence of the right to control as the "primary" factor); *Stamp*, 9 P.3d at 734–35 (holding that where "the right to control factor indicate[d] an employment relationship" and the other factors were neutral, "the right to control factor [was] dispositive").

The second factor, the furnishing of tools and equipment, slightly favors FedEx. FedEx's drivers provide their own vehicles and are not required to get other equipment from FedEx. On the other hand, the vast majority of drivers do get their other equipment from FedEx. Indeed, the drivers' scanners are not readily available from other sources. Numerous Oregon cases find employee status even though the employee provides his or her own vehicle or tools. *E.g.*, *Rubalcaba*, 43 P.3d at 1111; *Great Am. Ins. Co.*, 475 P.2d at 418; *Blaine*, 355 P.2d at 465; *Bowser*, 185 P.2d at 891; *Stamp*, 9 P.3d at 734.

The third factor, method of payment, is neutral. FedEx pays its drivers according to a complicated scheme that includes fixed and variable components and ties payment to, among other things, packages, stops, and the ratio of driving time to deliveries. This payment method cannot easily be compared to either hourly payment (which favors employee status) or per-job payment (which favors independent-contractor status). *See Stamp*, 9 P.3d at 734 (holding that where payment is not hourly or per-job, the method of payment is a neutral factor).

The last factor, right to terminate, slightly favors FedEx. Workers who can be terminated only for cause may nonetheless be employees. *See Giltner v. Commodore Contract Carriers*, 513 P.2d 541, 542 (Or. Ct. App. 1973) (finding employee status where employer could fire employee for breach of "duties or obligations"). However, "[t]he fact that a party could terminate a contract only for bona fide reasons of dissatisfaction" supports a finding of independent-contractor status. *Or. Drywall Sys.*, 958 P.2d at 198. An arbitration clause in a contract is evidence against an unqualified right to terminate. *Bob Wilkes Falling, Inc. v. Nat'l Council on Comp. Ins.*, 878 P.2d 1136, 1139 (Or. Ct. App. 1994). Here, the OA contains an arbitration clause and does not give FedEx an unqualified right to terminate. FedEx's right under the OA to terminate its drivers, while broad, is somewhat constrained. FedEx may terminate a driver for any "breach[] or fail[ure] to perform . . . contractual obligations," which would cover, for example, any failure to act "with proper decorum at all times." We conclude that this factor does not favor FedEx enough to allow a finding that its drivers are independent contractors. *See Giltner*, 513 P.2d at 542.

c. Summary

Viewing the evidence in the light most favorable to FedEx, we conclude that the OA grants FedEx a broad right to control the manner in which its drivers perform their work. The first and most important factor of the right-to-control test thus strongly favors employee status. The other three factors do not strongly favor either employee status or independent-contractor status. Accordingly, we hold that plaintiffs are employees as a matter of law under Oregon's right-to-control test. *See Rubalcaba*, 43 P.3d at 1111; *Stamp*, 9 P.3d at 733.

2. Economic-Realities Test

Plaintiffs also are employees under Oregon's economic-realities test. The economic-realities test is broader than the right-to-control test, covering "situations where the worker is not directed or controlled by the employer but, nevertheless, as a matter of economic reality, depends on the employer." *Cejas*, 316 P.3d at 394. In *Cejas*, the court applied the economic-realities test by looking to a number of different factors designed to determine whether a company formally or functionally "controls the terms and conditions of the worker's employment." *Id.* at 399. FedEx, as we have already held, controls the terms and conditions of plaintiffs' employment. FedEx's drivers are a permanent and important part of its business. They work every day FedEx delivers packages, for 9.5 to 11 hours per day. They are overseen by FedEx-employed managers, who evaluate their job performance and may refuse to let them work. Therefore, they are also employees under the economic-realities test. *See id.* at 398–400.

## C.  FedEx's Cross-Appeal

FedEx cross-appeals the MDL Court's class-certification decisions on two grounds.  First, FedEx argues that the named plaintiffs, who no longer work for FedEx, cannot seek prospective relief on behalf of current FedEx drivers. Therefore, FedEx argues, we should reverse the MDL Court's certification of plaintiffs' claims for injunctive and declaratory relief.  Second, FedEx argues that we should reverse the MDL Court's certification of all of plaintiffs' claims if we rely on individualized evidence in reversing the MDL Court's grant of summary judgment to FedEx.

### 1.  Plaintiffs' Ability to Seek Prospective Relief

In both *Slayman* and *Leighter*, the MDL Court certified the named plaintiffs' claims for damages under Federal Rule of Civil Procedure 23(b)(3) and their claims for prospective relief under Rule 23(b)(2).  FedEx argues that the named plaintiffs cannot represent the classes certified under Rule 23(b)(2).  FedEx does not object to the named plaintiffs' representation of the Rule 23(b)(3) classes.

FedEx argues that the named plaintiffs, as former FedEx drivers, lack Article III standing to seek prospective relief. "In a class action, the plaintiff class bears the burden of showing that Article III standing exists." *Ellis*, 657 F.3d at 978.  Standing requires that (1) "the plaintiff suffered an injury in fact," (2) "the injury is fairly traceable to the challenged conduct," and (3) "the injury is likely to be redressed by a favorable decision."  *Id.* (internal quotation marks omitted). "Standing exists if at least one named plaintiff meets the requirements."  *Id.*

"When evaluating whether [the standing] elements are present, we must look at the facts as they exist at the time the complaint was filed." *Am. Civil Liberties Union of Nev. v. Lomax*, 471 F.3d 1010, 1015 (9th Cir. 2006) (emphasis and internal quotation marks omitted). Named plaintiffs who were not FedEx drivers at the time the complaint was filed lacked standing to seek injunctive or declaratory relief because they "would not stand to benefit from" such relief. *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006); *see Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 623 (9th Cir. 2010) (en banc), *rev'd on other grounds*, 131 S. Ct. 2541 (2011). However, any named plaintiff who was a FedEx driver at the time the complaint was filed did have standing to seek injunctive and declaratory relief. *See Dukes*, 603 F.3d at 623. Because none of the *Slayman* class's named plaintiffs worked for FedEx at the time the complaint was filed, the *Slayman* class lacked Article III standing to seek prospective relief. *See id.* On the other hand, the *Leighter* class had standing to seek prospective relief because one of its named plaintiffs, Jon Leighter, was a FedEx driver at the time the complaint was filed.

Leighter, however, stopped driving for FedEx in August 2007, almost two years before the MDL Court's class-certification decision. Leighter was the only named plaintiff with standing to seek prospective relief. When he stopped driving for FedEx, his claims for prospective relief became moot because he could no longer benefit from such relief. *See Walsh*, 471 F.3d at 1037. Under these circumstances, the *Leighter* class's claims for prospective relief should not have been certified. *See Kuahulu v. Emp'rs Ins. of Wausau*, 557 F.2d 1334, 1336–37 (9th Cir. 1977). "It is . . . true that a class action is not automatically moot because the named representative's claim is moot." *Id.* at 1336. If the district

court certifies a class before the plaintiff's claim becomes moot, "mooting the putative class representative's claim will not moot the class action." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011); *see Sosna v. Iowa*, 419 U.S. 393, 399–403 (1975). But where, as here, the plaintiff's claim becomes moot before the district court certifies the class, the class action normally also becomes moot. *Kuahulu*, 557 F.2d at 1336–37; *see Bd. of Sch. Comm'rs of Indianapolis v. Jacobs*, 420 U.S. 128, 129 (1975) (per curiam).

An exception to this rule exists for claims that "are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *Pitts*, 653 F.3d at 1090 (quoting *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991)) (internal quotation mark omitted). Such claims are "capable of repetition, yet evading review," and thus do not become moot. *Id.* (internal quotation marks omitted). In the absence of any evidence that FedEx terminated Leighter's employment after the complaint was filed, his claims were not "transitory" or "capable of repetition, yet evading review." *See id.* at 1091 (defining a "transitory" claim as one that "would evade review," either "by its very nature" or "by virtue of the defendant's litigation strategy").

We therefore hold that the *Slayman* class lacked Article III standing to seek prospective relief, and the *Leighter* class's claims for prospective relief became moot before the MDL Court certified the class. Therefore, we reverse the MDL Court's certification of plaintiffs' class claims for prospective relief.

## 2. Reliance on Individualized Evidence

FedEx argues that we should reverse the MDL Court's certification of all of plaintiffs' claims if we "rel[y] on individualized (rather than classwide) evidence to reverse the MDL [C]ourt's grant of summary judgment." Our decision does not rely on any individualized evidence. FedEx's argument is therefore unavailing.

## Conclusion

We hold that plaintiffs in both class actions are employees as a matter of law under Oregon's right-to-control and economic-realities tests. Accordingly, we reverse both the MDL Court's grant of summary judgment to FedEx and its denial of plaintiffs' motion for partial summary judgment. We remand to the district court with instructions to enter summary judgment for plaintiffs on the question of employment status. We reverse the MDL Court's decision to certify plaintiffs' classes insofar as they seek prospective relief. The parties shall bear their own costs on appeal.

**REVERSED and REMANDED.**