NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ACCORD TRUCKING, INC., *Plaintiff/Appellant*,

*v.*

FEDEX GROUND PACKAGE SYSTEM, INC., *Defendant/Appellee*.

No. 1 CA-CV 23-0710

FILED 10-29-2024

Appeal from the Superior Court in Maricopa County
No. CV2018-010982
The Honorable Susanna C. Pineda, Judge
The Honorable John C. Rea, Judge (Retired)
The Honorable Joseph P. Mikitish, Judge

**AFFIRMED**

COUNSEL

McGill Law Firm, Scottsdale
By Gregory G. McGill, Ryan G. McGill
*Counsel for Plaintiff/Appellant*

Fisher & Phillips LLP, Phoenix
By Lori A. Guner
*Counsel for Defendant/Appellee*

FedEx Ground Package System, Inc., Moon Township, Pennsylvania
By Gregory M. Monaco, Shanicka L. Kennedy (*pro hac vice*)
*Counsel for Defendant/Appellee*

————————————————

**MEMORANDUM DECISION**

Presiding Judge Michael J. Brown delivered the decision of the Court, in which Judge D. Steven Williams and Judge Daniel J. Kiley joined.

————————————————

**B R O W N**, Judge:

**¶1**        Plaintiff Accord Trucking, Inc. ("Accord") appeals from the superior court's order granting judgment as a matter of law ("JMOL") on several contract and tort claims brought against Defendant FedEx Ground Package System Inc. ("FedEx").[1]  Each claim stems from Accord's position that FedEx improperly classified Accord as an independent contractor instead of an employee.  For the following reasons, we affirm.

**BACKGROUND**

**¶2**        We view the evidence in the light most favorable to Accord, the party against whom JMOL was granted.  *Warne Investments, Ltd. v. Higgins*, 219 Ariz. 186, 194, ¶ 33 (App. 2008).  Hogan spent much of her professional life working as a truck driver.  In 2015, she formed her own corporation, Accord, so she could provide linehaul trucking services for FedEx.  It was Hogan's understanding that FedEx would not contract with individuals, partnerships, or limited liability companies; instead, she had to form a corporation before she could work with FedEx.  At the time, FedEx's relationship with such corporations were governed by a Linehaul Contractor Operating Agreement ("LCOA"), which provided for a one-year term, with automatic renewal for successive terms unless either party gave 30 days' notice of termination.

**¶3**        The LCOA's "Background Statement" described the parties' intentions for the relationship between FedEx and its linehaul service providers.  That portion stated in part as follows:

> Contractor wants to make [its] equipment available, together with a qualified operator for each piece of equipment, to provide linehaul and other services on behalf of FedEx Ground.  FedEx Ground wants to provide for package pick-

————————————————

[1]        Susan Hogan, president of Accord, prevailed on her individual claim for negligent infliction of emotional distress.  Hogan is not a party to this appeal.

up and delivery services through a network of nationwide stations served by independent contractors, and, subject to the number of packages tendered to FedEx Ground for shipment, will seek to manage its business so that it can provide sufficient volume of packages to Contractor to make full use of Contractor's equipment.

This section also explained that "[b]oth FedEx Ground and Contractor inten[d] that Contractor will provide these services strictly as an independent contractor."

¶4         Under the LCOA, the linehaul contractors were responsible for all maintenance and other operating expenses associated with their trucks. Contractors were not paid a set wage or salary; instead, their compensation would come through weekly settlements with FedEx, which were largely based on mileage. The LCOA further provided that "the Contractor shall be responsible for exercising independent discretion and judgment to achieve the business objectives" set out in the LCOA, and that "FedEx Ground shall [not] have the authority to direct Contractor as to the manner or means employed to achieve such objectives."

¶5         The LCOA also included a system for assigning runs to contractors, which was done through a point system that assigned points to specific tractors the contractors own.[2] Under this system, a tractor gains a point for each day it was available for service, regardless of whether FedEx made an offer to handle a run. But a tractor would not gain a point if the contractor declined to service a run, or the tractor was otherwise unavailable. A tractor could also lose points in some circumstances, such as a preventable accident or other service disruptions. Contractors would then use these points to bid on different run assignments. This system also required a 90 percent availability threshold, meaning that a tractor needed to be available for service with FedEx 90 percent of the time on a rolling 12-month basis; otherwise, that tractor would be designated a "spare."[3] Spare tractors were not given run assignments and did not accrue points.

---

[2]      A tractor is the front part of the truck, which pulls the trailer. FedEx owned and supplied the trailers for the contractors.

[3]      As FedEx personnel explained at trial, it would normally take several months of consistent declining of runs to drop below the 90 percent threshold.

**¶6** In June 2015, Hogan signed the LCOA on behalf of Accord, though she later claimed she was not given sufficient time to review its contents. She also asserted the point system was not sufficiently explained to her when she began driving for FedEx. Nevertheless, Accord grew steadily, starting with two tractors in 2015 and adding three more over the next three years. Near the end of 2017, however, Hogan essentially came to the opinion that despite the language of the LCOA, FedEx did not give Accord the autonomy and discretion of an independent contractor. According to Hogan, FedEx exercised significant control over Accord's operations and in how it provided services to FedEx. The factors Hogan identified included, but were not limited to:

(1) FedEx's requirement until 2017 that Accord put FedEx logos on its trucks, which Hogan felt made it impossible for Accord to use those trucks for other companies.

(2) Accord's trucks using FedEx's U.S. Department of Transportation number and being registered and insured in FedEx's name.

(3) FedEx prohibiting Accord's drivers from going faster than 65 miles per hour, regardless of any posted speed limit, and that speed was monitored through equipment installed on the tractor.

(4) FedEx providing routes that Accord's drivers were encouraged to follow.

(5) FedEx required any drivers Accord hired to first be approved through their vendor, First Advantage.

(6) The point system's requirement effectively forced Accord to have constant availability to work with FedEx.

In August 2018, Accord sued FedEx. The 20-page complaint alleged many ways that FedEx engaged in "calculated and deceitful use of the LCOA," resulting in an "egregious misclassification of Accord as an independent contractor in order to avoid taxes, costs and burdens the employment relationship requires. . . ." Accord alleged "the subterfuge breached the duty of good faith and fair dealing" as well as the "express provisions" of the LCOA. Accord also included claims for negligent and fraudulent misrepresentation, and violations of the Arizona Consumer Fraud Act.

Separately, Hogan alleged negligent infliction of emotional distress ("emotional distress").[4]

¶7            One month after Accord filed its suit, FedEx discontinued the LCOA and instead began using a new contract, the Transportation Service Provider Agreement ("TSPA"). The TSPA removed the LCOA's reference to Accord being an "independent contractor," instead stating that FedEx and Accord would enter a "business to business relationship." The TSPA also omitted the LCOA's provision that FedEx intended to make "full use" of Accord's equipment; instead, the TSPA explicitly noted that it was a "requirements contract." Despite having filed its lawsuit, Accord signed the TSPA in September 2018. The litigation continued throughout the remainder of the parties' contractual relationship.

¶8            Over the next couple of years, the business relationship between Accord and FedEx deteriorated. Accord believed that both the quality and quantity of its run assignments were declining. Hogan claimed that, from late 2018 into 2019, FedEx stopped sending Accord's trucks on cross-country runs, which provided more miles and thus more revenue, and instead assigned Accord shorter runs in the southwest. Hogan also claimed that Accord had frequent issues with their trucks "sitting" on run assignments, meaning that Accord's drivers were experiencing long delays once they arrived at their assignment location. As a result, Accord's trucks were not generating revenue and stayed idle for extended periods. The issue with "sitting" trucks, according to Hogan, occurred weekly until 2022. On the other hand, FedEx claimed that starting in 2019, Accord had started refusing run assignments, resulting in three of Accord's trailers being relegated to "spare" status, as their availability had fallen below the 90 percent threshold. FedEx also claimed it eventually "lost all contact" with Accord, and in June 2022, FedEx gave Accord a notice of non-renewal.

¶9            FedEx moved for summary judgment. FedEx argued that (1) Accord could not prove damages arising from the alleged misclassification, (2) FedEx had violated no contractual provision regarding the assignment of runs, (3) the misrepresentation and fraud claims were barred by the economic loss rule and were impermissibly based on promises of future conduct, and (4) the consumer fraud statute was inapplicable because Accord was not a "consumer" as the term is statutorily defined. Accord likewise moved for partial summary judgment, asserting FedEx's liability on all claims. The court granted summary judgment for FedEx on the

_____

[4]      The emotional distress claim centered on events that are not relevant to the resolution of the claims raised in this appeal.

consumer fraud claim but found genuine issues of material fact on the remaining claims.

¶10 Accord's expert, Donald Bays, drafted three reports for calculating damages. The first report calculated Accord's economic damages from the alleged misclassification and calculated a hypothetical salary for Hogan if she had been a FedEx employee based on her job duties along with certain other benefits such as paid leave, insurance, and "legally required benefits" such as social security and Medicare. The report also assumed that, as an employee, Hogan would not have been responsible for paying Accord's operating expenses. Bays's second report analyzed Accord's damages arising from FedEx's failure to dispatch Accord's tractors, related to Hogan's claim that FedEx had caused Accord's trucks to sit for too long. The third report calculated lost earnings from FedEx "deliberately not awarding [Accord] delivery routes," which prevented Accord from growing the size of its truck fleet. That report assumed that Accord was an independent contractor, not an employee.

¶11 In a series of motions, FedEx sought to preclude Bays's proposed expert testimony on damages. After briefing, the court ruled that Accord could not establish damages under the first report by "creating a hypothetical contract based on fair compensation that contradicts the specific terms of compensation in the contract," and that at trial Accord would need to establish the right to recover operating expenses "by statute or other applicable authority." The court applied a similar analysis to the second report. As to the third report, the court determined that the report was "entirely divorced from [Accord's] claims" because it did not turn on whether Accord was misclassified, and thus the court precluded the third report in its entirety. Even so, at a subsequent pretrial conference, the court found that Accord's complaint sufficiently pled an alternative breach of contract claim. Under this theory, FedEx violated the implied covenant of good faith and fair dealing ("implied covenant") by intentionally having Accord's tractors sit for too long, which Accord claimed was a form of retaliation for filing its lawsuit. Because this theory could stand even if Accord were an independent contractor, the court reversed its ruling that excluded the third Bays's report.

¶12 After re-assignment of the case to a different judge as part of the superior court's periodic rotation of judicial assignments, the case proceeded to trial, where Accord claimed that if it was FedEx's employee, then Accord was entitled to "all the [operating] expenses that [Accord] had to pay," which included the costs of tractor acquisition, fuel, and maintenance. Accord also argued it was entitled to a payment of minimum

wage along with a "reasonable amount of benefits." In a subsequent discussion with the court, Accord's counsel clarified that its claim for wages, benefits, and expenses was rooted in A.R.S. §§ 23-350 to -362, ("Arizona Wage Act"), which authorizes employees to sue their employers for failure to pay wages due. A.R.S. § 23-355(A). Accord did not allege a separate claim under the Wage Act. Hogan testified about the history of Accord and FedEx, including the circumstances under which she entered the LCOA and TSPA, along with her belief about why she was not a true independent contractor. She also detailed the expenses Accord incurred through its business, and the eventual decrease in runs, which led to termination of the business relationship. A few of Accord's previous drivers also testified. Several FedEx personnel testified about their understandings as to the LCOA and TSPA, including the function and procedures in the point system. Bays was Accord's final witness, and he testified on the damage calculations in his three reports.

¶13            FedEx moved for JMOL under Arizona Rule of Civil Procedure 50 on Accord's claims for (1) breach of the implied covenant due to misclassification (to the extent it could be considered a "claim"), (2) alternative breach of the implied covenant based on FedEx's alleged failure to properly assign runs,(3) negligent and fraudulent misrepresentation, and (4) emotional distress. The court granted JMOL in favor of FedEx on each claim except for emotional distress. As to Accord's implied covenant claim that FedEx had misclassified it as an independent contractor ("the misclassification claim"), the court determined that Accord failed to establish a basis for its damages claim, finding that the definition of "employee" in the Arizona Wage Act does not include corporations.

¶14            Addressing the claim that FedEx alternatively breached the implied covenant by failing to assign runs to Accord and having tractors sit for extended periods of time, the court first determined that Accord did not present evidence that FedEx breached any term of the LCOA or TSPA in assigning (or failing to assign) runs to Accord. The court then explained that Hogan's testimony about her run assignments decreasing after her lawsuit began was insufficient evidence that FedEx had "abused its discretion or acted dishonestly in assigning runs or administering the point system."

¶15            On the negligent misrepresentation claim, the court found that FedEx was not a "supplier of information," and thus could not be liable for negligent misrepresentation. Lastly, the court determined that Accord provided no evidence at trial that FedEx knew that any representation

made in the contract was false.  The court then entered a final judgment and Accord timely appealed.  We have jurisdiction under A.R.S. § 12-2101(A)(1).

## DISCUSSION

**¶16**       Accord argues the superior court's JMOL ruling was erroneous.  We review such a ruling de novo, *Glazer v. State*, 237 Ariz. 160, 167, ¶ 29 (2015), viewing the evidence and all reasonable inferences in a light favorable to the nonmoving party, *Warne Investments, Ltd.*, 219 Ariz. at 194, ¶ 33.  A court should grant JMOL only if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on the issue judgment is sought.  Ariz. R. Civ. P. 50(a)(1).

## I.       Procedural Issues Affecting JMOL

### A.       Improper Horizontal Appeal

**¶17**       Accord argues the court's grant of JMOL constituted an improper horizontal appeal of the prior decision denying summary judgment of the same claims.  A horizontal appeal occurs when a party asks a second judge to reconsider a decision made by a prior judge in the same matter, even though no new circumstances justify such a request.  *Quinn v. Cardenas*, 256 Ariz. 77, 85 (App. 2023).  Though such appeals are discouraged, the policy barring them is procedural; "a court does not lack the power to change a ruling simply because it ruled on the question at an earlier stage, especially where a substantial change has occurred in the evidence."  *Sholes v. Fernando*, 228 Ariz. 455, 458–59, ¶ 8 (App. 2011) (citation omitted).  A motion for summary judgment and a motion for JMOL occur during substantially different points during the litigation process.  *Compare* Ariz. R. Civ. P. 50(a) *with* Ariz. R. Civ. P. 56.  A motion for JMOL can be made only after a party has been "fully heard on an issue during a jury trial."  Ariz. R. Civ. P. 50(a).  Because such a change in procedural posture offers "new circumstances" that warranted reconsideration, the superior court's decision to grant JMOL did not constitute a horizontal appeal.

### B.       Principle of Party Presentation

**¶18**       Accord argues the superior court's JMOL ruling violated the principle of party presentation because the grounds the superior court relied on had not been disclosed or argued before trial.  Under the party presentation principle, courts should "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present."  *Greenlaw v. United States*, 554 U.S. 237, 243 (2008).  Thus,

courts should "normally decide only questions presented by the parties." *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020).

**¶19** The record does not show any violation of this principle. Primarily, Accord takes issue with the court's reliance on the definitions in Arizona's wage statutes in granting JMOL on the misclassification claim, alleging that such arguments were not raised during the litigation until the court's JMOL ruling. But the following exchange after Accord's opening statement shows otherwise:

> The Court: [I]n your opening statement you said these are expenses an employee should not have to pay. There's got to be a basis for that. It's not—and it can't be Bays'[s] opinion. It's got to be a statute or some other form of authority that says an employer can't require an employee to pay these expenses just like the cases say.
>
> [Accord's counsel]: Yeah, which is what I cited before several times which is [A.R.S. §] 23-350, which is the statutory scheme for wages and benefits as a public policy in the state of Arizona when you're an employee.

Given that Accord expressly relied on that statute to support its theory of damages, the court was obligated to apply that statute correctly. *See Cook v. Cook*, 209 Ariz. 487, 496, ¶ 32 n.9 (App. 2005) ("Parties cannot stipulate as to the law applicable to a given state of facts and bind the court.") (citation omitted). Though Accord likely did not anticipate that citing this statute would justify judgment against it later, it cannot reasonably contend the court's JMOL ruling on this issue was an unfair surprise at trial. Accord has not shown there was a violation of the party presentation principle or disclosure requirements.[5]

## II.    Substantive Merits of Judgment

### A.    Misclassification – Alleged Breach of Implied Covenant

**¶20** Accord argues the court incorrectly determined it could not establish damages for its misclassification claim based on violation of the

---

[5]    Accord asserts that "[t]he defense violated the party presentation principle" but does not explain how a "party" could violate the principle. What Accord seems to argue in substance is that FedEx violated Rule 26.1's disclosure requirements. Because Accord introduced this statute into the case, there was no such violation.

implied covenant because Accord was not an "employee" under the Arizona statutes governing the payment of wages. *See* A.R.S. §§ 23-350, -355 ("Arizona Wage Act"). At trial, Accord's theory of damages centered on Arizona wage statutes. Accord argued that had FedEx properly classified it as an employee, it would have been entitled to payment of minimum wage, reimbursement for operating expenses, as well as other incidental benefits such as vacation and sick time. Whether Arizona wage statutes afford these benefits to Accord is a question of statutory interpretation we review de novo. *S. Ariz. Home Builders Ass'n v. Town of Marana*, 254 Ariz. 281, 284, ¶ 16 (2023). We interpret statutes "neither narrowly nor liberally, but rather according to the plain meaning of the words [of the statutes] in their broader statutory context." *Id.* at 286, ¶ 31.

**¶21**        Under the Arizona Wage Act, an "employee" is defined as "any person who performs services for an employer under a contract of employment either made in this state or to be performed wholly or partly within this state." A.R.S. § 23-350(2). Conversely, an "employer" can be "any individual, partnership, association, joint stock company, trust or corporation, the administrator or executor of the estate of a deceased individual or the receiver, trustee or successor of any of such persons employing any person." A.R.S. § 23-350(3). Section 23-362, which provides the definitions for statutes governing payment of minimum wage, likewise defines "employee" as "any person who is or was employed by an employer," and "employer" as "any corporation, proprietorship, partnership, joint venture, limited liability company, trust, association, political subdivision of the state, individual or other entity acting directly or indirectly in the interest of an employer in relation to an employee." A.R.S. § 23-362(A), (B). The superior court found that the definition of employee included only a "person," and not a corporation, which is specifically used in the definition of "employer." Thus, the court determined the statutes that provided the basis for Accord's theory of damages did not contemplate that a corporation could be an employee.

**¶22**        In determining whether Accord could be an employee under these statutes, we recognize that "[w]here the legislature has specifically used a term in certain places within a statute and excluded it in another place, courts will not read that term into the section from which it was excluded." *Ariz. Bd. of Regents for & on Behalf of Univ. of Ariz. v. State*, 160 Ariz. 150, 157 (App. 1989). The wage statutes Accord relies on include "corporation" in the definition of "employer," but not in the definition of "employee." "Employee" is defined simply as a "person." A.R.S. § 23-350(2). To conclude that a corporation can be an "employee" would require us to read, into the statutory definition, a term that was omitted

10

there, but explicitly used elsewhere in the same statute. *See id.*; *see also Jessey Sports, LLC v. Intercollegiate Men's Lacrosse Coaches Ass'n, Inc.*, 888 S.E.2d 677, 681 (N.C. Ct. App. 2023) (reasoning that a limited liability company was not an employee under North Carolina's Wage and Hour Act because the definition of "employer" included individuals as well as different kinds of legal entities, while the term "employee" referred only to individuals).

¶23 On appeal, Accord does not address this statutory language, and instead cites to several provisions in Arizona's workers compensation statutes to argue that "public policy pronouncements" prohibit "misclassification of independent contractors through 'misrepresentation, false statements, fraud, intimidation, coercion, or duress." *See* A.R.S. § 23-902(F); *see also* § 23-902(B) (noting that an employer who contracts with an independent contractor may be treated as an employer of the contractor's employees if the employer "retains supervision or control" over the contractor's work); § 23-902(D)(1) (noting a written agreement shall state that the business "[d]oes not require the independent contractor to perform work exclusively for the business"). None of these provisions imply, much less specify, that a corporation like Accord should be considered an employee under Arizona's wage statutes.

¶24 Both at trial and on appeal, Accord has sporadically invoked the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, to argue that federal law also required reimbursement of expenses. But neither in the superior court nor on appeal has Accord cited a specific provision of the FLSA requiring such reimbursement. And even assuming that Accord properly raised this argument, the FLSA defines "employee" as "any *individual* employed by an employer," 29 U.S.C. § 203(e)(1) (emphasis added), and an employer as a "person," which is further defined as "an individual, partnership, association, *corporation*, business trust, legal representative, or any organized group of persons," 29 U.S.C. § 203(a), (d) (emphasis added). Thus, for the same reasons explained regarding Arizona's statutes, *supra* ¶¶ 21–22, it seems apparent that Accord would not be an "employee" under the FLSA.

¶25 Accord also points to several decisions from other jurisdictions holding that FedEx had misclassified the plaintiff employees as independent contractors. *See Estrada v. FedEx Ground Package Sys. Inc.*, 64 Cal.Rptr.3d 327 (Cal. App. 2007); *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981 (9th Cir. 2014); *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033 (9th Cir. 2014). But these cases are distinguishable. All were class action cases in which individuals asserted FedEx hired them as drivers but then denied them benefits guaranteed to employees under applicable

state and federal law. *Estrada*, 64 Cal.Rptr.3d at 335 (citing Cal. Lab. Code § 2802); *Alexander*, 765 F.3d at 987 (noting the plaintiff drivers brought claims under the California Labor Code and federal Family and Medical Leave Act); *Slayman*, 765 F.3d at 1042 (citing Or. Rev. Stat §§ 652.610, 653.621). None of these cases involve a claim by a corporation seeking to be treated as an employee. Accord has cited no relevant authority supporting its claimed damages relating to its misclassification claim, and thus Accord has shown no error.

## B. Alternate Implied Covenant Claim

**¶26** Accord also contends the court incorrectly granted JMOL on its claim that FedEx breached the implied covenant by failing to assign runs to Accord after Accord filed this lawsuit. Both the LCOA and TSPA identify Pennsylvania law as governing the contracts, and we analyze the contracts accordingly. *See Ciena Cap. Funding, LLC v. Krieg's Inc.*, 242 Ariz. 212, 216, ¶ 11 (App. 2017). Despite those provisions, Accord does not cite any Pennsylvania law in its briefing. Even so, because our review is de novo, we decide this issue based on our own review of the pertinent legal authority as well as the arguments that were fairly presented to the superior court and raised in parties' briefs.

**¶27** Pennsylvania law implies a covenant of good faith and fair dealing in every contract, *John B. Conomos, Inc. v. Sun Co., Inc. (R&M)*, 831 A.2d 696, 706, ¶ 16 (Pa. Super. Ct. 2003), which requires "honesty in fact in the conduct or transaction concerned," *Donahue v. Fed. Ex. Corp.*, 753 A.2d 238, 242, ¶ 11 (Pa. Super. Ct. 2000) (citation omitted). This obligation allows enforcement of a contract's terms "in a manner that is consistent with the parties' reasonable expectations." *Agrecycle, Inc. v. City of Pittsburgh*, 783 A.2d 863, 867 (Pa. Commw. Ct. 2001). However, this implied covenant is specifically tied to the express terms of the contract, and the implied covenant cannot and will not contradict the express terms of the contract. *Conomos*, 831 A.2d at 706–07, ¶ 17.

**¶28** Accord contends that FedEx engaged in "manipulative conduct" by removing the "full use" verbiage found in the LCOA when it transferred to the TSPA. Accord believes this language provided a reasonable expectation as to the amount of freight FedEx would provide, and that FedEx "used its disparate bargaining power" to remove the "full

use" language from the TSPA.[6]  In effect, Accord believes that FedEx violated the implied covenant by the language it used in drafting the TSPA, before it was even signed.  But Accord cites no authority for its position that a party can breach the implied covenant by choosing to include or omit certain contractual provisions before the contract is signed.  Moreover, under Pennsylvania law, the implied covenant is tethered to the express terms of the contract.  *Id.*  The conduct giving rise to this claim—that FedEx retaliated against Accord by cutting its run assignments—occurred under the TSPA, which made no representations about any volume expectations.

¶29            Also, under Pennsylvania law the implied covenant does not permit adding terms to a contract that are not present or are disclaimed expressly in the contract itself.  In *Agrecycle*, a composting company claimed a city breached the implied covenant by failing to deliver a certain volume of compostable material represented in the city's bid for composting services.  *Agrecycle*, 783 A.2d at 866.  Rejecting the company's argument that the trial court erred in refusing to instruct the jury on that alleged breach, the appellate court held that even though the bid specifications estimated a certain amount of compostable material, the parties' agreement stated that the city "did not warrant or guarantee the quantity or quality of the compostable materials to be delivered."  *Id.* at 868.  Similarly, in *Kaplan v. Cablevision of PA, Inc.*, 671 A.2d 716, 722 (Pa. Super. Ct. 1996), a customer filed a class action complaint against a cable company, alleging it violated the implied covenant by failing to "provide continuous service or voluntarily rebate fees paid in advance by the cable subscribers when an outage occurs."  Affirming dismissal, the appellate court concluded that nothing in the agreement guaranteed such service or required rebates for

---

[6]     It is not clear that the "full use" language would have given Accord any reasonable expectation as to a certain volume of freight even under the LCOA.  The full sentence in which that wording is found states:

> FedEx Ground wants to provide for package pick-up and delivery services through a network of nationwide stations served by independent contractors, and, *subject to the number of packages tendered to FedEx Ground for shipment*, will seek to manage its business so that it can provide sufficient volume of packages to Contractor to make full use of Contractor's equipment.

(Emphasis added).  Under the terms of the LCOA, any vague guarantee as to the amount of work available for Accord would necessarily be restricted by FedEx's needs.

interrupted service, and thus there was no lack of good faith or fair dealing. *Id.* Here, nothing in the TSPA shows that FedEx made any warranties or guarantees as to the volume of work Accord would receive or that Accord's run schedules would be optimized to generate the maximum revenue possible. Accord has shown no error.

### C.    Negligent Misrepresentation

**¶30**        Accord alleged that FedEx negligently misrepresented that Accord would be an independent contractor, despite numerous provisions of the contractual agreements that gave FedEx control over Accord's operations. Because these terms "failed to facilitate an [independent contractor] relationship" as the contract stated, Accord believed FedEx "supplied false or incorrect information."

**¶31**        The superior court granted judgment for FedEx on that claim because nothing showed that FedEx was a "supplier of information," meaning it could not be liable for negligent misrepresentation. Arizona has adopted the Restatement (Second) of Torts, § 552 (1977) to delineate the tort of negligent misrepresentation. *St. Joseph's Hosp. & Med. Ctr. v. Rsrv. Life Ins. Co.*, 154 Ariz. 307, 312 (1987). Section 552(1) states that:

> One who, in the course of his business, profession or employment, *or in any other transaction in which he has a pecuniary interest*, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts, § 552(1) (1977) (emphasis added).

**¶32**        FedEx maintains that liability for negligent misrepresentation is limited to "suppliers of information," which, it argues, includes entities that are typically "in the profession or business of supplying information for the guidance of others in business transactions." *See id.* cmt. (A) (limiting "the liability for negligence of a supplier of information to be used in commercial transactions"). But we do not read this section of the Restatement to limit liability for negligent misrepresentation only to those who are in a regular business of supplying information; instead, the tort applies to anyone who supplies false information for the guidance of others "in any other transaction in which he has a pecuniary interest." Restatement (Second) of Torts, § 552(1) (1977); *see also Sain v. Cedar Rapids Comm. Sch. Dist.*, 626 N.W.2d 115, 124–25 (Iowa 2001) (recognizing that the

Restatement offers a broader view of potential liability for negligent misrepresentation than Iowa's rule, which limits any duty only to those "persons in the business or profession of supplying information to others"). We therefore do not agree that Accord could not, as a matter of law, be a supplier of information for purposes of a negligent misrepresentation claim. Nonetheless, we will affirm the entry of JMOL "if it is correct for any reason." *See Spooner v. City of Phoenix*, 246 Ariz. 119, 123, ¶ 7 (App. 2018).

**¶33** A claim for negligent misrepresentation cannot be based on promises for future conduct. *McAlister v. Citibank (Arizona)*, 171 Ariz. 207, 216 (App. 1992). Instead, a negligent misrepresentation claim requires "a misrepresentation or omission of a *fact*," and "[a] promise of future conduct is not a statement of fact capable of supporting a claim of negligent misrepresentation." *Id.* Even if the contractual relationship ended up resembling an employment relationship more than an independent contractor, the provisions that Accord relied on are promises of future conduct between the parties. *See Manon v. Solis*, 142 S.W.3d 380, 388 (Tex. Ct. App. 2004) (finding that a party's representations about the future conditions of the other party's employment were promises of future conduct, not existing statements of fact, precluding a claim of negligent misrepresentation). Accord has cited no authority showing that a party can be liable for negligent misrepresentation based on the legal ramifications of the terms in the contract. And nothing presented at trial indicates FedEx misrepresented any existing fact to induce Accord to sign the LCOA or TSPA. *See McAlister*, 171 Ariz. at 216. Thus, JMOL was appropriate for Accord's negligent misrepresentation claim.

### D. Common Law Fraud

**¶34** Finally, Accord claims the court incorrectly found there was insufficient evidence of fraud. "A claim for fraud requires proof of nine elements by clear and convincing evidence: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely on it; (9) the hearer's consequent and proximate injury." *Comerica Bank v. Mahmoodi*, 224 Ariz. 289, 291–92, ¶ 14 (App. 2010)

**¶35** Accord argues that "fraud can be proven by circumstantial evidence," and that it presented such evidence at trial. Accord is correct that knowledge of a statement or representation's falsity can be inferred from circumstantial evidence. *See Dawson v. Withycombe*, 216 Ariz. 84, 98,

¶ 32 (App. 2007). But some evidence on which that inference is based is still required; fraud is never presumed, and requires more than "doubtful, vague, speculative, or inconclusive evidence." *Honk v. Karlsson*, 80 Ariz. 30, 37 (1956) (quotation omitted). Accord claims that it presented "substantial evidence at trial that when FedEx executed the LCOA and TSPA contract with Accord . . . [FedEx] knew the independent contractor representations in the [] agreements were false," but Accord does not identify any such evidence in the record. Even assuming, as Accord argues, that "the relationship under the contracts bore no relationship to the reality on the ground," evidence that the contracts inaccurately characterized Accord's status as that of an independent contractor does not mean that the contracts' characterization of Accord's employment status was a "fact" that FedEx knew to be false. *See De May v. Moore & Bruce, LLP*, 584 F. Supp. 2d 170, 185 (D.D.C. 2008) (dismissing plaintiffs' claim against former attorneys for constructive fraud based on inaccurate legal advice because plaintiffs failed to offer "any support for the proposition that erroneous legal advice can constitute a factual misrepresentation, nor has the Court's research unearthed such a case"). Accord has shown no error, and we affirm the court's ruling.

**CONCLUSION**

¶**36** We affirm the superior court's judgment. Both parties have requested attorneys' fees incurred on appeal under A.R.S. § 12-341.01, which authorizes a discretionary fee award when a dispute arises out of contract. As FedEx is the prevailing party, we award reasonable attorneys' fees to FedEx relating to the claims for breach of contract and breach of the implied covenant. As the successful party on appeal, FedEx is entitled to recovery of taxable costs. The award of fees and costs is subject to compliance with ARCAP 21.

